**AGRISTOR LEASING, a Wisconsin Partnership, Plaintiff,**

v.

**Gene E. and Rose M. MEULI, Defendants and Third Party Plaintiffs,**

v.

**A.O. SMITH CORPORATION, INC., et al., Third Party Defendants.**

**No. 84–1527–K.**

United States District Court,
D. Kansas.

April 29, 1986.

Gordon E. Wells, Jr., Overland Park, Kan., for plaintiff.

Brock R. Snyder, Topeka, Kan., for defendants and third party plaintiffs.

Monte Vines of Adams, Jones, Robinson & Malone, Wichita, Kan., and William Hergenreter, Shaw, Hergenreter & Quarnstrom, Topeka, Kan., for third party defendants.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

Plaintiff, AgriStor Leasing (AgriStor) brought this action against defendants Gene E. and Rose M. Meuli (Meuli) alleging breach of lease and wrongful detention of certain farm equipment. The leased equip-ment included a Harvestore system, which is a large grain silo designed for preserving and storing feed for livestock, and a Slurry-store system, which is designed for pre-serving manure for fertilization. Plaintiff has previously repossessed the Harvestore and Slurrystore systems and now seeks damages for defendants' failure to pay rent. Defendants have counterclaimed alleging strict liability, negligence, breach of warranties, fraudulent misrepresenta-tion, violations of usury laws, and viola-tions of the Kansas Consumer Protection Act. They seek compensatory and punitive damages as well as attorney fees. Defend-ants have also brought a third party com-plaint against A.O. Smith Corporation, Inc. (Smith), A.O. Smith Harvestore Products, Inc. (AOSHPI), Mid-America Harvestore, Inc. (Mid-Am), and Robert Gattshall, and assert the same allegations in the counter-claim against these parties. Additionally, defendants claim AOSHPI has violated the Racketeer Influenced and Corrupt Orga-nization Act (RICO), 18 U.S.C. § 1962(c).

The matter is now before the Court on the motions of plaintiff and third party defendants for summary judgment on all counts. For the reasons stated below, Smith's and AgriStor's motions are granted in their entirety. AOSHPI's, Mid-Am's and Gattshall's motions are granted except as to the claim of breach of implied warranty of merchantability, fraudulent misrepresen-tation, and certain violations of the Kansas Consumer Protection Act.

Gene and Rose Meuli are farmers resid-ing near Abilene, Kansas. Smith is a New York corporation currently engaged in the manufacture and sale of automotive frames, water heaters and electric motors. Smith originally began designing and man-ufacturing the Harvestore in the late 1940's. In 1961, third party defendant AOSHPI, a Delaware corporation, was in-corporated to develop, manufacture and distribute Harvestore equipment. AOSH-PI is a wholly-owned subsidiary of Smith. Smith no longer has any part in the design, manufacture or marketing of the Harve-

store products. AOSHPI also manufactures Slurrystore systems.

AOSHPI is a party to a dealer sales and service agreement with Mid-Am, a Kansas corporation. Under the agreement, Mid-Am is an independent dealer and distributor of AOSHPI products. Mid-Am sells, assembles, installs and services Harvestore and Slurrystore equipment. At all relevant times to this lawsuit, Mid-Am employed Robert Gattshall as a salesman.

Mid-Am is a party to a dealer agreement on leasing with plaintiff AgriStor. There is no formal corporate relationship between Mid-Am and AgriStor. AgriStor is a Wisconsin general partnership composed of AgriStor Credit Corp., a Delaware corporation, and Steiner Financial Corp., a Utah corporation. AgriStor Credit Corp. is a wholly-owned subsidiary of third party defendant Smith. AgriStor is in the business of leasing farm equipment, especially Harvestores and Slurrystores, to individual farmers. AgriStor does not design, manufacture, or install Harvestore or Slurrystore equipment. Under its dealer agreement with Mid-Am, Mid-Am is under no obligation to obtain financing through AgriStor. Likewise, AgriStor has no obligation to approve any application received from Mid-Am. The agreement on leasing provides in paragraph B(2): "Dealer has not made and will not make any agreements, warranties or representations on behalf of AgriStor and the terms contained in each lease agreement constitute the only understanding between AgriStor and the lessee named therein in connection with the equipment."

Under the lease agreement, if AgriStor approves a lease application submitted by Mid-Am, it purchases the equipment from Mid-Am and leases it to the farmer. Although AgriStor formally purchases the equipment and takes title, it never has actual possession of it. Mid-Am has the sole responsibility for obtaining the equipment from the manufacturer and installing it. Once the equipment is installed, the farmer must make payments to AgriStor as specified in the parties' lease agreement. Agri-Stor employees generally have no contact with the farmer until after the purchase agreement for the equipment has been finalized.

On May 7, 1981, the Meulis executed an agricultural equipment lease agreement with AgriStor for a Harvestore system. The Meulis agreed to pay rent in eight annual installments of $15,960.55 each, commencing on May 15, 1982, and continuing through and including May 15, 1989. On March 16, 1982, the Meulis entered into another agricultural equipment lease with AgriStor for a Slurrystore system. The Meulis agreed to pay rent to AgriStor in eight annual payments of $17,040.29, continuing through May 1, 1990.

Prior to entering the leases, the Meulis signed purchase orders with Mid-Am for both the Harvestore and the Slurrystore systems. In signing the purchase order, the Meulis acknowledged that they had "read and understood the terms and conditions printed on the front and reverse sides of the purchase order, including warranties, disclaimers and terms and conditions herein given ... either by the manufacturer or seller." The purchase order further provides:

Buyer understands the conditions of use of the products and is not relying on the skill or judgment of the Manufacturer or Seller in selecting them because Buyer acknowledges that farming and livestock feeding results are very much the product of individual effort combined with various climatic soil, water, growing and feeding conditions which are beyond the control of the Manufacturer and Seller. Buyer recognizes that any advertisements, brochures, and other written statements which he may have read, including any farm profit plan which may have been shown to him, as well as any oral statement which may have been made to him concerning the potential of the Harvestore and/or Slurrystore units and allied machinery and equipment, are not guaranties and he has not relied upon them as such because the products will be under Buyer's exclusive management

and control. Buyer understands that the sole warranty, express or implied which is provided by A.O. Smith Harvestore Products, Inc., herein the Manufacturer and/or the Seller is as follows:

## WARRANTY OF MANUFACTURER AND SELLER

If within the time limits specified below, any product sold under this purchase order, or any part thereof shall prove to be defective in material or workmanship upon examination by the Manufacturer, the Manufacturer will supply an identical or substantially similar replacement part f.o.b. the Manufacturer's factory, or the Manufacturer, at its option, will repair or allow credit for such part. The Seller warrants only that the foundation will be properly installed and that the product will be erected in strict conformance with the Manufacturer's specifications.

The lease agreement between the Meulis and AgriStor provides that the lessor has not made any warranties, either express or implied. However, stamped on the front of the lease is the following provision: "NOTICE TO CERTAIN KANSAS LESSEES—Notwithstanding the terms hereof to the extent prohibited by Kansas law, no exclusion, modification, or limitation herein of any implied warranty of merchantability or fitness for a particular purpose otherwise applicable to this transaction or any remedy provided lessee by law, including the measure of damages, shall apply to a lease made within the State of Kansas where lessee is a natural person or sole proprietorship."

The lease agreement further states that lessee has not relied on representations by the sales person, that lessee will install and maintain the equipment in good repair at his expense, that lessee will continue to pay rent if the equipment does not operate as warranted, and that the lessee's exclusive remedy shall be to make a claim against the supplier named in the purchase order. The agreement states, "Lessor authorizes lessee, during the term of this lease, to assert all of lessor's rights under any warranty with respect to equipment at lessee's expense."

Prior to entering the purchase order or the lease agreement, the Meulis dealt only with Mid-Am's salesman, Mr. Gattshall. Mr. Gattshall prepared projections of the savings and advantages which the Meulis would enjoy if the Harvestore was used effectively. These projections were based on information Gattshall gathered mainly from AOSHPI publications. The Meulis have submitted copies of brochures about the Harvestore system which were given them by Gattshall before the sale. The Meulis claim they relied on representations in these brochures in deciding whether to buy the Harvestore system. Installation of the system on their property was completed in May of 1981. The Meulis allege they began to notice problems with unloading the feed in the Harvestore structure soon after it was installed. They notified Mid-Am of these problems, and all repairs were undertaken by Mid-Am.

On May 31, 1983, the Meulis entered a lease deferral agreement with AgriStor for rental payments on both the Harvestore and Slurrystore. The payments were deferred to November 15, 1983, and November 1, 1983, respectively. Then, in November of 1983, Mr. Meuli wrote a letter to AgriStor stating, "My operation with the Harvestore and Slurrystore are working as projected and hope to make them more efficient ..." He went on to explain that the reason he was delinquent with his payments was due to problems with his bankers. The Meulis failed to make the deferred payments due in November, 1983, and failed to make the rental payments due in May, 1984. In August of 1984, AgriStor filed a complaint seeking damages and repossession of the Harvestore and Slurrystore systems.

The Meulis filed their original counterclaim on September 12, 1984. They allege they were fraudulently induced to lease the equipment because of statements by Robert Gattshall and AOSHPI (in sales brochures), that the structure was oxygen limiting when, in fact, it is not. Because this

defect affected the quality of the feed stored inside, defendants assert their cattle were injured. They also allege the Slurry-store system did not replace the need for other fertilizer, as represented. The Meulis claim that AOSHPI knew of these problems long before the false representations were made to them. They claim there are reports and interoffice memorandums which show that AOSHPI has chosen to ignore data contrary to their claims that the system is oxygen limiting and to conceal it from the public. Defendants state that they have an expert who will testify that the Harvestore does not control access of oxygen and moisture as well as conventional silos. He will testify that AOSHPI's representations were false.

*Liability of Smith*

■ Smith argues that the Meulis have advanced no legal theory upon which to base their claims against Smith. Smith asserts that its separate corporate existence from AOSHPI should not be disregarded. The Meulis, by contrast, argue that Smith is responsible for much of Harvestore's design work, even after 1961 when AOSHPI was formed, and for its part in the concealment of the Harvestore's alleged defects.

Smith argues the Meulis have failed to produce sufficient evidence to justify piercing the corporate veil. The law in Kansas is that a holding or parent corporation has a separate corporate existence and is treated separately from its subsidiary in the absence of circumstances justifying disregard of the corporate entity. *Quarles v. Fuqua Industries, Inc.*, 504 F.2d 1358 (10th Cir.1974). While the power to pierce the corporate veil is to be exercised reluctantly and cautiously, the corporate entity can be disregarded if it is used to cloak or cover fraud or illegality, or to work injustice, or if necessary to achieve equity. *Sampson v. Hunt*, 233 Kan. 572, 665 P.2d 743, 751 (1983); *Amoco Chemical Corp. v. Bach*, 222 Kan. 589, 567 P.2d 1337 (1977); *Kilpatrick Bros., Inc. v. Poynter*, 205 Kan. 787, 473 P.2d 33 (1970). The doctrine of

alter ego fastens liability on an individual or corporation which uses a corporate entity merely as an instrumentality to conduct its own business, such liability arising from fraud or injustice perpetrated on third parties who deal with the corporation. Furthermore, the separate entity of a corporation and the persons who comprise it may be case aside and disregarded if it appears the corporation is merely a business "conduit". *Sell v. United States*, 336 F.2d 467 (10th Cir.1964). In *Intern U., United Auto, Etc. v. Cardwell Mfg. Co.*, 416 F.Supp. 1267, 1286 (D.Kan.1976), the court enumerated the following factors which would justify disregarding a corporate entity: (1) the parent corporation owns all or a majority of the capital stock of the subsidiary; (2) the parent and subsidiary corporations have common directors or officers; (3) the parent corporation finances the subsidiary; (4) the parent corporation subscribes to all of the capital stock of the subsidiary or otherwise causes its incorporation; (5) the subsidiary had grossly inadequate capital; (6) the parent corporation pays the salaries or expenses or losses of the subsidiary; (7) the subsidiary has substantially no business except with the parent corporation, or no assets except those conveyed to it by the parent corporation; (8) in the papers of the parent corporation, and in the statements of its officers, "the subsidiary" is referred to as such or as a department or division; (9) the directors or executives of the subsidiary do not act independently in the interest of the subsidiary, but take direction from the parent corporation; and (10) the formal legal requirements of the subsidiary as a separate and independent corporation are not observed. *See also Sampson v. Hunt*, 233 Kan. 572, 665 P.2d 743. No one factor is conclusive. *Service Iron Foundry, Inc. v. M.A. Bell Co.*, 2 Kan.App.2d 662, 588 P.2d 463 (1978).

Smith admits it owns 100% of AOSHPI's stock; that they share some common officers and directors; that Smith caused the incorporation of AOSHPI in 1961; and that Smith refers to AOSHPI as a "subsidiary". However, no facts have been developed by

the Meulis to show parental financing, grossly inadequate capitalization, parental payment of expenses, complete business and asset ties, failure of directors and officers to act independently in the interest of the subsidiary, or failure to observe formal legal requirements. The Meulis have developed no facts showing that Smith's relationship with AOSHPI is so intimate, its control so dominating, or its assets so mingled, that recognizing AOSHPI as a separate entity from Smith would work injustice. The Meulis are not burdened by such a finding as AOSHPI is solvent, and any judgment they may obtain against it will be satisfied. The U.S. District Court of Minnesota, in *AgriStor Leasing v. Guggisberg*, 617 F.Supp. 902, 906 (D.Minn.1985), found that Smith was free from liability in regard to Harvestore products due to its separate corporate identity from AOSHPI. *See also AgriStor Leasing v. Kjergaard*, No. 4-83-756 (D.Minn. Mar. 20, 1985) [Available on WESTLAW, DCTU database] (unpublished).

Because in this case the Meulis have not shown that AOSHPI has been operated in an unjust manner or that it is an alter ego of Smith, AOSHPI must be treated as a legal entity separate and apart from Smith. Accordingly, Smith's motion for summary judgment will be granted as to all claims against it.

*The Nature of the "Lease Agreement"*

■ The viability of some of the Meulis' claims depends on whether the "lease agreement" between AgriStor and the Meulis was a "true lease" or a disguised sale and security interest.

The agreement between the Meulis and AgriStor was designated an "Agricultural Equipment Lease Agreement," and on page 3 states, "This agreement creates a true lease and not a sale, conditional sale or installment sale and is not a secured transaction." By its own terms, AgriStor "leases" to the Meulis, and the Meulis pay "rent". Of course, construction of this document is subject to the rule that the true nature and character of a document is not determined by the name attached thereto but by the intent of the parties as reflected by the terms or contents thereof. *Atlas Industries, Inc. v. National Cash Register, Inc.*, 216 Kan. 213, 220, 531 P.2d 41 (1975).

Kansas employs an "economic realities" test to determine whether a transaction labeled as a lease is actually an installment sale. *K-B Trucking Co. v. Riss International Corp.*, 763 F.2d 1148 (10th Cir.1985). The "economic reality" most indicative of a "sale" is an option to purchase at the end of the lease term for a nominal price. *Atlas*, 216 Kan. at 220, 531 P.2d 41; *CIT Financial Services, Inc. v. Gott*, 5 Kan. App.2d 224, 228, 615 P.2d 774 (1980). *See also Citicorp Leasing, Inc. v. Allied Institutional, Etc.*, 454 F.Supp. 511 (W.D.Okla. 1977). K.S.A. 84-1-201(37) defines "security interest" and provides in part:

Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option of becoming the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

In this case, paragraph 19 of the lease gives the lessee an option to purchase the equipment at the expiration of the lease term for a price equal to the "fair market value" of the equipment. The lease then defines "fair market value" as an amount "equal to the value which would be obtained in an arms length transaction between an informed and willing buyer (other than a lessee currently in possession or a used equipment dealer) and an informed and willing seller under no compulsion to sell ... such fair market value shall be determined by an agreement between lessor and lessee, or, if they cannot agree, by an independent appraiser."

This Court is convinced that an option to purchase for "fair market value" is not

nominal. At least one commentator has suggested that the Kansas Supreme Court would agree with this view. *See* Note *Commercial Law—Supplier in Kansas Tripartite Finance Held Liable for Warranty Violations—Discussion of Issues Surrounding Finance Leases*, 25 K.L.R. 573, 577 (1977). In this case, the term of the lease is eight years. Title remains with the lessor at all times. At the end of the term, lessee may renew the lease or exercise its option to purchase, otherwise the lessor will remove the equipment. In *In the Matter of Bill Mayron Marsh*, No. 11090 (B.Ct.Ind. Jan. 17, 1983) (unpublished), the court found that the useful life of a Harvestore is over 15 years, and that an option to purchase at the end of eight years for the fair market value is not a nominal purchase price. The court then found that AgriStor's lease agreement created a true lease. *Accord, AgriStor Leasing v. Kjergaard, supra.*

The Kansas Court of Appeals, in *Evco Distributing, Inc. v. Commercial Cred. Equip. Corp.*, 6 Kan.App.2d 205, 211, 627 P.2d 374 (1981), was persuaded that a transaction involving the sale of equipment for subsequent lease to a third party lessee was a true lease rather than a financing agreement because (1) the lessor stipulated it was in the business of purchasing and leasing such equipment to third parties; (2) the lease and financing statements prepared by the lessor stated the transaction was a lease rather than a security interest; (3) the special financing agreement between the supplier and the lessor specifically provided that the lessor would either finance the equipment sales *or* purchase the equipment for lease; and (4) if the equipment was purchased and leased, the unencumbered title to the equipment vested in the lessor.

While the agreement between AgriStor and the Meulis did contain some provisions which point toward a sale/financing agreement (lessee to provide insurance, make repairs, pay taxes), the Court finds, on the balance, that the agreement is a true lease according to Kansas law.

## Relationship Between Mid-Am/Gattshall and AgriStor

The Meulis claim an agency relationship exists between AgriStor, Mid-Am and Gattshall. AgriStor's liability in several of the claims asserted by the Meulis depends on whether or not Mid-Am/Gattshall acted as AgriStor's agent. In *C.I.T. Financial Services, Inc. v. Gott*, 5 Kan. App.2d at 229, 615 P.2d 774, the Kansas Court of Appeals stated that the party relying on agency to establish his claim has the burden of establishing its existence by clear and convincing evidence, and whether there is any competent evidence tending to prove the relationship is a question of law for the court. The record in this case indicates that all negotiations for the acquisition of the equipment in question were conducted by Gattshall. There is no evidence to indicate AgriStor exercised any control over the business affairs of Mid-Am, or had any voice in setting its policies. Mid-Am did not require customers to finance through AgriStor. Likewise, Mid-Am had no authority to bind AgriStor. In *C.I.T.*, the Kansas Court of Appeals was met with a fact situation very similar to the one in the case at bar and found there was insufficient evidence to establish an agency relationship between the independent dealer and the finance lessor. In *AgriStor Leasing v. Schmidlin*, 601 F.Supp. 1307, 1313 (D.Or.1983); *AgriStor Leasing v. Hansen*, No. 4–84–632 (D.Minn. Feb. 13, 1985); and *AgriStor Leasing v. Kjergaard, supra*, the courts held that no agency relationship exists between Mid-Am, its salesmen, and AgriStor. Likewise, in the case at bar, the Court finds the defendants have failed to establish any evidence of the existence of an agency relationship.

## Summary Judgment Motions

Having decided these preliminary issues of law, the Court will now consider the plaintiff's and third party defendants' motions for summary judgment on each of the Meulis' claims.

In passing upon a motion for summary judgment, the Court is required to view the facts in the light most favorable to the party opposing the motion and give that party the benefit of all reasonable inferences to be drawn from the underlying facts disclosed in pleadings and affidavits. *United States v. Diebold,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Thus, these movants must establish their right to judgment as a matter of law; there must be no genuine issue of fact and no room for doubt or controversy. *Williams v. Borden,* 637 F.2d 731 (10th Cir.1980).

## A. *Usury*

■ The usury laws were enacted to prevent excessive rates of interest being charged consumers. Because the financing arrangement in this case was a lease, rather than a sale, the Meulis paid no interest and so there was not, as a matter of law, any violation of the usury laws. Therefore summary judgment is granted to all parties on this claim.

## B. *Strict Liability/Negligence*

■ The Meulis allege in Count VI of their amended counterclaim that the Harvestore equipment was defective in design, manufacture, and construction. They further allege these defects allowed an excessive amount of oxygen to enter the system, thereby spoiling the stored feed and damaging the cattle. They allege they are entitled to recover for their damages under a theory of strict liability in tort. In Count V of their amended counterclaim, the Meulis allege plaintiff and third party defendants negligently breached their duty to correct the design, manufacture and construction defects prior to the sale, and to provide field assistance after the sale.

AgriStor argues that it is a strictly a finance lessor rather than a commercial lessor, and therefore cannot be held strictly liable under Restatement (Second) of Torts § 402A. AgriStor further argues it cannot be held liable in negligence as it owes no duty to the Meulis with respect to the equipment.

Section 402A provides, "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused ... if ... the seller is engaged in the business of selling such a product and ... it is expected to and does reach the consumer without substantial change in the condition in which it was sold." The basic policy reason underlying the creation of the strict liability doctrine is that, as between consumers and those responsible for placing the defective products in the market, the latter should bear the loss. Some courts have held this policy supports the extension of strict liability to lessors of goods. *See Crowe v. Public Bldg. Comm.,* 74 Ill.2d 10, 23 Ill.Dec. 80, 383 N.E.2d 951 (1978). A distinction is drawn, however, between "commercial" lessors and "finance" lessors, with strict liability being imposed on the former but not the latter. A finance lessor is usually one who has no expertise with respect to the item it leases and usually does not take possession of it. The customer selects the property and negotiates the terms with the seller directly. *See M & M Leasing Corp. v. Seattle First Nat'l Bank,* 563 F.2d 1377, 1380–81 (9th Cir.1977), *cert. denied* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978). Policy reasons support the distinction between a finance and commercial lessor. First, the finance lessor is generally not the only member of the marketing chain available to the plaintiff for recovery. Second, since the finance lessor has no expertise with respect to the goods, imposition of strict liability would not be an incentive for safety. In *AgriStor Leasing v. Hansen, supra,* at 7–13, the court found that AgriStor is a finance lessor, and as such is not strictly liable in tort. *See also AgriStor v. Kjergaard, supra,* at 7–8. This Court concurs with the view that AgriStor is a finance lessor. Therefore, summary judgment will be granted to AgriStor on the Meulis' claim of strict liability. Moreover, summary judgment will be granted AgriStor on the negligence claim. AgriStor clearly had no direct involvement with the

design, manufacture or installation of the equipment. Because AgriStor had no responsibility with respect to these operations, it owed no duty to the defendants which it could breach.

■ AOSHPI, Mid-Am and Gattshall contend they are entitled to summary judgment on the tort claims because the Meulis have suffered only economic loss, and pure economic loss—as opposed to property damage—is not recoverable under strict liability or negligence. The Meulis, on the other hand, argue they suffered physical damage to their cattle (failure to gain weight), and physical damage to their crops (spoilage), as well as economic loss in their feeding operations. They claim even the economic loss should be recoverable under a tort theory.

Judge Rogers has met with an identical issue in *AgriStor Leasing v. Markley*, No. 81–4163 (D.Kan. June 8, 1984) (unpublished), wherein he astutely stated:

We hold that the alleged failure of defendants' cattle to gain weight and the alleged premature spoilage of grain are economic losses—not property damages recoverable under strict liability. It has been stated that to draw the distinction between economic loss and property damage, one must examine the nature of the defect, the type of risk, and the manner in which the injury arose to decide whether the safety-insurance policy of tort law or the expectation-bargain protection policy of warranty is applicable. *Pennsylvania Glass & Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d [1165] (3d Cir.1981), quoted in *Fordyce Concrete, Inc. v. Mack Trucks, Inc.*, 535 F.Supp. 118, 125 (D.Kan.1982). The alleged defect in this case permitted oxidation and spoilage of the grain in the silo system. This, in turn, led to problems in delivering the grain to defendants' cattle. In addition, the cattle allegedly did not perform well on the spoiled grain. This was a gradual process, one may assume. It did not involve the sudden, violent, or accidental damage to a person or property—the type of damage most often asso-

ciated with tort remedies. Furthermore, the type of risk associated with the defect alleged is exactly the risk the purchaser of a silo system would contemplate before making the decision to buy. In other words, the preservation of grain for cattle feeding was the expectation of defendants when they purchased the system. The alleged failure of the Harvestore system to do so relates more to a loss of the benefit of the bargain than to an unexpected loss to person or property.

For these reasons, we find that defendants are seeking to recover for economic losses in this case. Defendants claim that such losses are recoverable under the emerging law of strict liability in Kansas. The Court disagrees. Current Kansas law ... holds that economic losses are not recoverable in a strict liability action.

The defendants rely on *Fordyce Concrete, Inc. v. Mack Trucks, Inc.*, 535 F.Supp. 118, as authority that damage to their cattle was "damage to other property," and as such recoverable under a tort theory. The case is distinguishable. In *Fordyce*, Chief Judge O'Connor held that physical injury to a defective product is not an economic loss and is compensable under a tort theory. In *Fordyce*, the plaintiff's truck was injured when a chassis broke, causing the cab of the truck and the cement mixer installed on the chassis to separate and then collide. The injury to the truck, therefore, was sustained due to a hazardous condition, and a sudden, calamitous occurrence. This is clearly different than the case at hand where the damage resulted simply from the product's failure to live up to expectations.

This distinction as to the nature of the defect was employed by Judge Murphy in *AgriStor Leasing v. Guggisberg*, 617 F.Supp. at 908, in which she concluded that as a matter of law the alleged damage to the alfalfa feed and the holstein cows was a nonrecoverable economic loss. "The essence of [the] complaint is that the Harvestore failed to perform as expected and they seek to recover the resulting losses to

their dairy farm, the loss of the benefit of the bargain. Under such circumstances, the Court concludes, as a matter of law, that the [defendants'] alleged damage is an economic loss [and not damage to 'other property']." 617 F.Supp. at 908.

The Court finds the loss of weight of the cattle and the spoilage of the grain were economic losses, and therefore were nonrecoverable under any tort theory. Accordingly, third party defendants' motions for summary judgment on the claims of strict liability and negligence are granted.

## C. *Kansas Consumer Protection Act*

■ In Count III of their amended counterclaim, the Meulis contend the plaintiff and third party defendants engaged in certain specified deceptive acts in violation of K.S.A. 50–626, and unconscionable acts, including transacting a one-sided sale, making misleading statements, and unlawfully disclaiming warranties, in violation of K.S.A. 50–627. In relief of these violations, the Meulis pray for actual damages, civil penalties, and attorney fees as provided for in K.S.A. 50–634.

K.S.A. 50–634 provides for "private remedies" for consumers aggrieved by a violation of the Kansas Consumer Protection Act. Under subsection (2), "A consumer who is aggrieved by a violation of this act may recover ... actual damages or a civil penalty as provided in K.S.A. 50–636(a) [$2,000 for each violation] ... whichever is greater."

The plaintiff and third party defendants argue the statute of limitations has run as to the plea for civil penalties, and also as to the plea for actual damages in connection with the Harvestore sale on May 7, 1981. K.S.A. 60–514(3) provides that an action upon a *civil penalty* shall be brought within one year. K.S.A. 60–512(2) provides "an action upon a liability *created by statute* other than a penalty or forfeiture" must be brought within three years. Since the Meulis did not file their counterclaim until September 17, 1984, the third party defendants argue the limitation period has run as to the Harvestore lease. The Meulis, on

the other hand, argue the statute of limitations applicable to fraud (K.S.A. 60–513(a)(3)) should apply, as deceptive and unconscionable acts, under the Act, are analogous to fraud. The 2-year statute of limitations for fraud does not begin running until the fraud is discovered. K.S.A. 60–513(a)(3). The Meulis contend they did not discover the deception until 1983. Therefore, they argue the statute of limitations had not run when they asserted their counterclaims and third party claims in 1984.

The Kansas Consumer Protection Act was enacted to increase the protection of consumers against suppliers who engage in deceptive practices. As stated in the Kansas Comment, "Under this act, prior Kansas law is both broadened and made more specific." The Act provides consumers relief from deceptive or unconscionable acts by a supplier which might not necessarily rise to the level of fraud. *See, e.g.,* 50–626(b)(2) (exaggeration), and 50–626(b)(3) (omissions). Moreover, the Act, in 50–634, specifically provides for private remedies. Therefore, the 3-year statute of limitations in K.S.A. 60–512(2), and not the fraud statute of limitations, applies to the Meulis' claim for actual damages. Likewise, the 1-year statute of limitations in 60–514(3) applies to the Meulis prayer for civil penalties. Since the Meulis entered the lease for the Harvestore system in May of 1981 and did not file this action until September of 1984, the Meulis' claims under this Act with respect to the Harvestore system are barred. The Meulis did not enter the lease for the Slurrystore system until May of 1982; therefore, their claims under this Act as to that lease are not barred. However, the Meulis are barred from receiving the civil penalties provided for in the Act under either lease.

■ In regard to the Slurrystore lease, AgriStor claims it could not have made any "deceptive" or "unconscionable" representations, as it had no dealings with the Meulis. Moreover, Mr. Gattshall, who did deal with the Meulis, was not an agent of AgriStor. AgriStor also argues that it eliminat-

ed any improperly disclaimed warranties in the lease by the language stamped on the front of the lease which resurrected such warranties. These arguments are viable, and summary judgment is granted Agri-Stor as to the alleged violations of the Kansas Consumer Protection Act.

AOSHPI, Mid-Am, and Gattshall also claim they are not liable for the unlawful disclaimer of implied warranties under 50–637 or 50–639. They argue the language stamped on the lease eradicated any unlawful disclaimers. The Court agrees, and so will grant summary judgment on this issue.

Mid-Am and Gattshall have also moved for summary judgment on the 50–627(b)(5) claim that their transaction with the Meulis was one-sided. Whether a supplier's actions are unconscionable within the meaning of 50–627 is a question of law for the Court. In this case, the Meulis have presented no evidence in which the Court can find the transaction was unconscionably one-sided. The Meulis did not ask to have any input in the finalized agreement. Therefore, Mid-Am and Gattshall are entitled to summary judgment on this claim as a matter of law.

The Meulis' remaining claims that the Slurrystore transaction violated the Kansas Consumer Protection Act must be resolved by the trier of facts.

### D. *Warranties*

In Counts I and II of the Meulis' amended counterclaim, they claim the plaintiff and third party defendants are liable to them for breach of both express and implied warranties.

Under K.S.A. 84–2–313, any affirmation of fact or promise made by the seller to the buyer, or any description of the goods, which is made part of the basis of the bargain, creates an express warranty that the goods shall conform to the affirmation, promise, or description. In this case, the Meulis claim plaintiff and third party defendants made express warranties and representations to them about the oxygen limiting capacity of the Harvestore system, its ability to speed up their farming opera-

tions, to enhance the weight gain in their cattle, and to save them money in their farming operations. The Meulis further allege that the Harvestore and Slurrystore systems failed to perform as warranted, and therefore plaintiff and third party defendants breached their express warranties.

AgriStor argues that since it never dealt directly with the Meulis in their decision to lease the Harvestore and Slurrystore systems, it cannot be liable to them for breach of express warranties. The Court agrees. The only theory upon which AgriStor could be held liable for breach of express warranty is under an agency theory. Having previously determined no such relationship exists, AgriStor is entitled to summary judgment on this issue.

■ AOSHPI, Mid-Am, and Gattshall argue the only express warranty they made to the Meulis was contained in the purchase order. It granted repair and replacement of defective parts for a period of one year. The third party defendants point out that the Meulis signed the purchase order which, in the second disclaimer, states that no other express warranty has been made.

Under K.S.A. 84–2–316(1), express warranties may be excluded only under certain limited conditions. However, the statute, by its own terms, is subject to the parol evidence rule contained in K.S.A. 84–2–202. Therefore, if a modification or exclusion of an express warranty is contained in the final written expression between the parties, any prior oral warranty becomes ineffective.

In this case, the purchase order was clearly the final expression of agreement between Mid-Am and the Meulis. Therefore, the Meulis are bound by the limited express warranty which expired after one year. Despite the Meulis' claims to the contrary, this modification of an express warranty is not prohibited by the Kansas Consumer Protection Act. *See* K.S.A. 50–639(f). The Meulis quote language from the Kansas Comment to K.S.A. 50–639 in support of their contention that express

warranties cannot be excluded. However, their reliance is misplaced as the comment was drafted in 1973, prior to the deletion of the words "express warranty" from 50–639(a). That section, as amended, prohibits only the exclusion of implied warranties. Accordingly, the Meulis' claim for breach of express warranties fails as a matter of law, and the third party defendants are entitled to summary judgment on this claim.

■ K.S.A. 84–2–315 provides, "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required, and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is ... an implied warranty that the goods shall be fit for such purpose." The Meulis contend plaintiff and third party defendants represented to them that the Harvestore and Slurrystore systems would fit their particular farming needs, and the Meulis relied on their "skill or judgment" in selecting the Harvestore and Slurrystore systems. The Meulis further contend that the systems have failed to live up to this "particular purpose," and therefore plaintiff and third party defendants have breached the implied warranty of fitness for a particular purpose.

In the Kansas Comment to K.S.A. 84–2–315, it is noted that "a 'particular' purpose under this section means an unusual, nonordinary purpose." In *International Petroleum Services, Inc. v. S & N Well Service*, 230 Kan. 452, 461, 639 P.2d 29 (1982), the Kansas Supreme Court noted:

> The provisions of K.S.A. 84–2–315, covering the warranty of fitness for a *particular purpose*, are frequently confused with the implied warranty of merchantability which covers fitness for *ordinary purposes*. The warranty of fitness for a *particular purpose* is narrower, more specific, and more precise ...
>
> ... When goods are acquired for the *ordinary purposes* for which such goods are used, no implied warranty of fitness for a *particular purpose* arises. A use

for ordinary purposes falls within the concept of merchantability.

The Harvestore and Slurrystore systems were not sold to the Meulis for any "unusual" purpose. The Meulis intended to, and did, put them to their ordinary use. Therefore, there was no implied warranty for a particular purpose. Rather, the implied warranty of merchantability applies in this case.

■ The implied warranty of merchantability is found in K.S.A. 84–2–314. This provision states that in a contract for sale it is implied that the goods will be merchantable. In order to be merchantable, the goods must at least be fit for the ordinary purpose for which they are intended. 84–2–314(c). The warranty of merchantability applies only if the seller is a "merchant with respect to goods of that kind." "Merchant" is defined in K.S.A. 84–2–104 as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practice or goods involved in the transaction ..." AgriStor argues it cannot be held liable for breach of implied warranty, as it is not a "merchant".

As previously stated, AgriStor is a finance lessor. As such AgriStor is not a "merchant". *All-States Leasing Co. v. Bass*, 96 Idaho 873, 538 P.2d 1177 (1975). Accordingly, AgriStor has breached no implied warranties and is entitled to summary judgment on this issue. This same result was reached in *AgriStor Leasing v. Hansen, supra*, at 14–16, and *AgriStor Leasing v. Kjergaard, supra*, at 8.

■ AOSHPI argues the Meulis are barred from asserting the claim of breach of implied warranty of merchantability because they failed to give notice of the breach in compliance with K.S.A. 84–2–607(3)(a). That statute provides, "Where a tender has been accepted ... the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy ..." The Kansas Supreme Court, in *Dold v. Sherow*, 220

Kan. 350, 352, 552 P.2d 945 (1976), held that failure to plead and prove notice will bar a plaintiff from any remedy; as such, notice is a "condition precedent" to recovery. In this case, the Meulis had given no formal notice of breach when they filed their suit in September of 1984. They did give notice on November 26, 1984, prior to filing their amended complaint wherein they alleged that all conditions precedent had been met. AOSHPI argues this notice was untimely as a matter of law.

The Meulis counter by arguing the giving of sufficient notice is a question of fact. They contend their early request for repairs, the company's prior problems with the system, and the filing of the lawsuit were sufficient to put third party defendants on notice.

The purpose of the notice requirement is to provide the seller with an opportunity to correct defects, to prepare for negotiation and litigation, and to protect itself from stale claims which it has no opportunity to investigate. *White v. Mississippi Order Buyer*, 648 P.2d 682 (Colo.App.1982). The official UCC comment to 84-2-607(3) [comment no. 4] notes that "the rule of requiring notification is designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy."

There is a legitimate question of fact in this case as to whether AOSHPI was put on sufficient notice of breach of warranty. Therefore, insofar as this summary judgment motion is concerned, the claim for breach of implied warranty is not barred.

### E. *Fraudulent Misrepresentation*

In their seventh claim for relief, defendants allege plaintiff and third party defendants, through salesman Gattshall, and through sales brochures, made certain misrepresentations of material fact, including: the systems were oxygen-limiting; they would prevent spoilage of the grain stored in them; they would produce higher quality, more nutritious feed, resulting in reduction of defendants' protein purchases and enhanced weight gain in cattle; and they would cause farm profits to increase.

Defendants further claim plaintiff and third party defendants intentionally concealed the fact that the Harvestore system was inherently defective in that rather than limiting oxygen to the silo-like structure, oxygen was actually forced in, resulting in substantial deterioration in the nutrient content of the feed.

AgriStor moves for summary judgment claiming it made no representations to defendants whatsoever, and so cannot be held liable for "misrepresentations". As Gattshall was not AgriStor's agent, AgriStor's motion will be granted.

In Kansas, the elements of fraudulent misrepresentation require the making of a representation that is false, pertaining to a past or present fact which is material; the fact must be susceptible of knowledge; the representer must know it to be false or must assert it as of his own knowledge without knowing whether it is true or false; the representer must intend to have the other person induced to act; that person must be so induced to act or justified in acting; the action must be in reliance upon the representation; and the person must suffer damage which is attributable to the misrepresentation. *See Nordstrom v. Miller*, 227 Kan. 59, 605 P.2d 545 (1980).

While this Court has grave doubts as to the viability of a fraud claim in this action, in third party defendants' motion for summary judgment they argue only that the statute of limitations on fraud has run, thereby barring the Meulis claim. Under K.S.A. 60-513(a)(3), the 2-year statute of limitations for fraud begins to run when the fraud is discovered or could reasonably have been discovered. The third party defendants argue the Meulis were aware of problems with the Harvestore from the start; that during 1981 and 1982 the Meulis knew of the problems with the unloading and poor weight gain in the cattle. The Meulis claim they did not know of the cattle's failure to gain weight until late fall of 1983. They further argue that the other problems with the system were represented by Mid-Am as easily correctible.

In *Wolf v. Preferred Risk Life Ins. Co.*, 728 F.2d 1304 (10th Cir.1984), the Tenth Circuit held that the moment when the fraud is or should have been discovered for purposes of the running of the limitations period is a question of fact. The Court noted that "[s]ome Kansas cases have rejected statute of limitations contentions when the plaintiff could have discovered the fraud, but the defendant lulled the plaintiff into confidence that nothing was amiss. *Dreiling v. Home State Life Ins. Co.*, 213 Kan. 137, 515 P.2d 757 (1973); *Stegman v. Professional & Businessmen's Life Ins. Co.*, 173 Kan. 744, 252 P.2d 1074 (1973)."

Third party defendants argue that Judge Rogers' opinion in *AgriStor Leasing v. Markley*, No. 81–4163 (D.Kan. Aug. 1, 1984) (unpublished), which held that the statute of limitations had run on defendants' fraud claim because the plaintiff could reasonably have discovered the fraud more than two years before filing the claim, is controlling in this case. However, in *Markley*, the defendants completely abandoned use of the system due to its inadequacies more than two years before filing suit. The Markleys did not allege they were lulled into believing the system could be fixed. Thus, *Markley* is readily distinguishable from the case at bar where the question of when the alleged fraud could have been discovered is an issue of material fact. Therefore, summary judgment will not be granted third party defendants on this claim.

## F. RICO

 The civil RICO claim herein is asserted only against AOSHPI. The Meulis allege, in Count VIII of their amended counterclaim, that AOSHPI violated 18 U.S.C. § 1962(c). They claim AOSHPI is a "person" within the meaning of 18 U.S.C. § 1961(3), and was associated with the enterprises Smith, Mid-Am, AgriStor, and Gattshall. They further allege AOSHPI participated, directly and indirectly, in the conduct of the affairs of these enterprises through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). The alleged "predicate acts" are the mailing of Harvestore promotional materials by AOSHPI to Mid-Am, which the Meulis claim is "mail fraud" under 18 U.S.C. § 1341. The alleged "pattern" is repeated incidences of such mailings over the past 10 years. The Meulis further allege they were injured in their business and property by reason of this violation, suffering damages of lost profits and earnings, damaged business reputation, physical damage to their cattle and crops, payments due under the lease, and emotional distress. The Meulis claim they are entitled to treble damages and attorney fees pursuant to 18 U.S.C. § 1964(c).

In order to prove a substantive RICO violation under 18 U.S.C. § 1962(c), the claimant must prove the defendant—any person—was employed by, or associated with, an enterprise which affected interstate commerce, and the defendant participated in: (1) conduct, (2) of the enterprise, (3) through a pattern, (4) of racketeering activity. *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. ——, ——, 105 S.Ct. 3275, 3285–86, 87 L.Ed.2d 346, 358–59 (1985). The gravamen of a RICO offense is the conduct of an enterprise through a pattern of racketeering activity. *United States v. Phillips*, 664 F.2d 971 (5th Cir.1981), *cert. denied* 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166.

"Racketeering activity" is defined in § 1961(1) as any act chargeable under several generically described state criminal laws, any act indictable under numerous specific federal provisions, including mail and wire fraud, and any offense involving bankruptcy or securities fraud or drug related activities punishable by federal law.

Section 1962 "prohibited activities" outlaws the use of income derived from a *pattern* of racketeering activities. "Pattern of racketeering activity" is defined in § 1961(5) as requiring "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter, and the last of which occurred within 10 years after the commission of a prior act

of racketeering activity." The *Sedima* court, in a footnote, noted that the statutory definition requires *at least* two acts, but that in common parlance a "pattern" is rarely established by two isolated acts. 473 U.S. at ——, n. 14, 105 S.Ct. at 3285, n. 14, 87 L.Ed.2d at 358, n. 14. The court observes that "the extraordinary uses to which civil RICO has been put appear to be primarily the result of the breadth of the predicate offenses, in particular the inclusion of wire, mail and securities fraud, and the failure of Congress and the courts to develop a meaningful concept of 'pattern'." 473 U.S. at ——, 105 S.Ct. at 3287, 87 L.Ed.2d at 361. As a consequence of these observations in *Sedima,* many recent RICO decisions have focused on interpreting the statutory definition of "pattern".

"Person" is defined in § 1961(3) as "any individual or entity capable of holding a legal or beneficial interest in property"; and "enterprise" is defined in § 1961(4) as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." The vast majority of courts hold that for purposes of § 1962, the "person" and the "enterprise" must be two separate entities. *Bennett v. United States Trust Co.,* 770 F.2d 308, 314–15 (2d Cir.1985); *Haroco, Inc. v. Am. Nat'l Bank & Trust Co.,* 747 F.2d 384, 400 (7th Cir.1984), *aff'd on other grounds* 473 U.S. ——, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985); *Rae v. Union Bank,* 725 F.2d 478, 481 (9th Cir.1984); *Bennett v. Berg,* 685 F.2d 1053, 1061 (8th Cir.1982), *reh. en banc,* 710 F.2d 1361, *cert. denied* 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983); *Medallion TV Enterprises v. SelecTV of California,* 627 F.Supp. 1290 (C.D.Cal. 1986); and *Saine v. A.I.A.,* 582 F.Supp. 1299 (D.Colo.1984).

Under § 1962(c), the "person" must engage in *conduct* of the enterprise *through* a pattern of racketeering activity. The terms "conduct" and "through" are not defined by statute. Common sense dictates that an integral relationship between the pattern of racketeering activity and the conduct of the enterprise's affairs is essential to give meaning to these terms. Therefore, the "person" committing the racketeering activity must have at least some involvement in the management or everyday affairs of the "enterprise" in order to satisfy the "conduct through" requirement. In *Bennett v. Berg,* 710 F.2d 1361 (8th Cir.), *cert. denied* 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983), the Eighth Circuit Court of Appeals, in finding that a RICO complaint was deficient for failing to adequately allege the requisite degree of participation in the affairs of an enterprise by the defendant, stated:

> Mere participation in the predicate offenses listed in RICO, even in conjunction with a RICO enterprise, may be insufficient to support a RICO cause of action. A defendant's participation must be in the conduct of the affairs of a RICO enterprise, which ordinarily will require some participation in the *operation or management* of the enterprise itself.

710 F.2d at 1364 (emphasis added).

According to the court in *Bennett,* then, § 1962(c) prohibits a person associated with an enterprise from directing the course of or managing the affairs of the enterprise by means of a pattern of racketeering activity. In other words, a violation of § 1962(c) occurs only when the racketeering activity is being used as an integral part of the management of the enterprise's affairs. *See also United States v. Mandel,* 591 F.2d 1347, 1375, *vacated on other grounds* 602 F.2d 653 (4th Cir.1979), *cert. denied* 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980) (conduct or participation requires some involvement in the operation of management of the business); *John Peterson Motors, Inc. v. General Motors Corp.,* 613 F.Supp. 887, 900 (D.Minn.1985) (a RICO defendant must play a dominant, active ownership or managerial role in the enterprise); *United States v. Kaye,* 586 F.Supp. 1395, 1400 (N.D.Ill.1984) (government must show defendant took part in direction or management of enterprise).

AOSHPI asserts that, as a matter of law, the Meulis have failed to prove that AOSHPI "conducted" the affairs of any of the alleged enterprises "through" a pattern of racketeering activity. AOSHPI further argues the Meulis have failed to prove a "pattern". For these reasons AOSHPI asserts it is entitled to summary judgment on the RICO claim as a matter of law. AOSHPI does *not* argue that the Meulis have failed to allege or prove, with sufficient particularity, the commission of a predicate racketeering activity. As previously stated, this Court has grave doubts as to whether the evidence shows that AOSHPI was involved in any scheme to defraud customers through intentional misrepresentation. In order to prove mail fraud under 18 U.S.C. § 1341, it must be shown that defendant: (1) devised a scheme or artifice to defraud, and (2) then used the mails for the purpose of executing the scheme. *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). Although this Court doubts that any conduct on the part of AOSHPI would be indictable under § 1341, AOSHPI has failed to raise this issue, and so the Court will not address it further and will proceed under the assumption that a viable claim of mail fraud exists.

In enacting RICO, it was the express purpose of Congress "to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new prohibitions and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." 84 Stat. 923; *United States v. Turkette,* 452 U.S. 576, 589, 101 S.Ct. 2524, 2532, 69 L.Ed.2d 246 (1981). To help achieve this purpose Congress created a private cause of action with treble damages and an award of attorney fees to any prevailing plaintiff "injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). In *Sedima,* the Supreme Court noted that "RICO is to be read broadly." 473 U.S. at ——, 105 S.Ct. at 3286, 87 L.Ed.2d at 359. The *Sedima*

court held that civil RICO plaintiffs need not plead a prior criminal conviction nor a separate "racketeering injury" before maintaining a private action under § 1964(c). The court noted "it is true that private civil actions under the statute are being brought almost solely against such defendants [i.e., respected businesses], rather than against the archetypal, intimidating mobster. Yet this defect—if defect it is—is inherent in the statute as written, and its correction must lie with Congress." 473 U.S. at ——, 105 S.Ct. at 3287, 87 L.Ed.2d at 361. However, the court went on to note that "the 'extraordinary' uses to which civil RICO has been put appear to be primarily the result of the breadth of the predicate offenses, in particular the inclusion of wire, mail, and securities fraud, and the failure of Congress and the courts to develop a meaningful concept of 'pattern'."

Being ever aware of the Supreme Court's admonition to construe the RICO Act broadly, this Court is convinced the uncontroverted facts in this case—even when viewed in the light most favorable to the Meulis—fail to establish a RICO violation as a matter of law. There is simply no conduct in this case—alleged or proved—of the type which Congress sought to abolish by enacting RICO. Specifically, the Meulis' claim must fail because: (1) AOSHPI did not conduct (i.e., operate or manage) the affairs of any of the alleged enterprises, and (2) AOSHPI engaged in no "pattern" of racketeering activity as that term has been defined in *Sedima* and its progeny. As previously stated, in order for a claimant to establish a 1962(c) claim, the claimant must show that the defendant "conducted" the enterprise through a pattern of racketeering activity. *Sedima,* 473 U.S. at ——, 105 S.Ct. at 3285, 87 L.Ed.2d at 358–59. "Conduct" of the affairs of a RICO enterprise requires some participation in the operation or management of the enterprise itself. *Bennett v. Berg,* 710 F.2d at 1364. In this case the Meulis assert Smith, AgriStor, Mid-Am, and Gattshall were each "enterprises", the affairs of which were conducted by AOSHPI. The

Meulis have failed to establish any facts upon which this Court could find that AOSHPI "conducted" the affairs of any of these alleged enterprises. This Court has previously found that each of these "enterprises" was separate and distinct from the others. Therefore, the Meulis have failed to prove, as a matter of law, one of the essential elements of a valid § 1962(c) claim. Further, the Meulis have failed to establish a "pattern of racketeering activity."

■ The threshold requirement under 18 U.S.C. § 1961(5) of establishing a "pattern of racketeering activity" is the showing of at least two predicate acts. However, as the Supreme Court noted in *Sedima*, "Proof of two acts of racketeering activity, without more, does not establish a pattern." 473 U.S. at ——, n. 14, 105 S.Ct. at 3285, n. 14, 87 L.Ed.2d at 358, n. 14 (quoting 116 Cong.Rec. 18,940 (1970) (statement of Sen. McClelland)). "The target of [RICO] is ... not sporadic activity, the infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." *Sedima*, 473 U.S. at ——, n. 14, 105 S.Ct. at 3285 n. 14, 87 L.Ed.2d at 358, n. 14 (quoting S.Rep. No. 91–617, p. 158 (1969) (emphasis in original)). Generally, to be related, the predicate acts of § 1964(c) claims must involve common perpetrators, methods of commission, victims, or motives. *See Graham v. Slaughter*, 624 F.Supp. 222, 225 (N.D.Ill.1985). To be "continuous", more than sporadic or isolated activity must be alleged. Courts differ on their interpretation of *Sedima*'s continuity requirement. Some courts require only that the predicate acts alleged be "related" to one another. *R.A.G.S. Couture, Inc. v. Hyatt*, 774 F.2d 1350 (5th Cir.1985). Other courts recognize that *Sedima* requires a RICO plaintiff to demonstrate both continuity and relationship among the predicate acts, but have refused to find that the acts must have taken place in furtherance of separate fraudulent schemes. *Trak Micro-Computer Corp. v.*

*Wearne Bros.*, 628 F.Supp. 1089 (N.D.Ill. 1985); *Graham v. Slaughter*, 624 F.Supp. 222. Still other courts have interpreted *Sedima*'s "continuity" requirement to indicate that the predicate acts must have taken place in the course of different criminal episodes or fraudulent schemes. *Superior Oil Co. v. Fulmer*, 785 F.2d 252 (8th Cir. 1986); *Grant v. Union Bank*, 629 F.Supp. 570 (D.Utah 1986); *Kredietbank v. Morris*, No. 84–1903 (D.N.J. Jan. 9, 1986); *Medallion TV Enterprises v. SelecTV of California*, 627 F.Supp. 1290 (C.D.Cal.1986); *Northern Trust Bank/O'Hare N.A. v. Inryco, Inc.*, 615 F.Supp. 828 (N.D.Ill.1985). Quite recently, Judge Saffels adopted the "schemes" interpretation in *Phelps v. The Wichita Eagle-Beacon*, 632 F.Supp. 1164 (D.Kan.1986).

The concept of "pattern" is essential to the operation of the RICO statute. As noted in *Sedima*, one isolated "racketeering activity" was thought by Congress to be insufficient to trigger the remedies provided, largely because the net would be too large and the remedies disproportionate to the gravity of the offense. 473 U.S. at ——, n. 14, 105 S.Ct. at 3285, n. 14, 87 L.Ed.2d at 358, n. 14. Consistent with this intent to exclude single criminal events, a "pattern" of racketeering activity must include racketeering acts sufficiently unconnected in time and substance to warrant consideration as separate criminal episodes. In *United States v. Moeller*, 402 F.Supp. 49, 57–58 (D.Conn.1975), it was astutely noted that "while the statutory definition makes clear that a pattern can consist of only two acts ... the common sense interpretation of the word 'pattern' implies acts occurring in different criminal episodes, episodes that are at least somewhat separated in time and place, yet still sufficiently related by purpose to demonstrate a continuity of activity."

In this Court's view, the definition which best conforms with *Sedima*'s "continuity plus relationship" requirement is that in order to establish a pattern, the predicate acts must have taken place in the course of different criminal episodes or fraudulent

schemes. In the case at bar, the Meulis have alleged no facts on which this Court could find there was more than one "fraudulent scheme." Any mailings of allegedly fraudulent sales literature were done to further sales of the Harvestore system by Mid-Am. This cannot be construed as entailing any more than one scheme. Therefore—as a matter of law—the Meulis have failed to establish a "pattern" of racketeering activity.

For these reasons, AOSHPI's motion for summary judgment will be granted as to the RICO claim.

IT IS ACCORDINGLY ORDERED this 29 day of April, 1986, that Smith's and AgriStor's motions for summary judgment be granted in their entirety; that the summary judgment motions of AOSHPI, Mid-Am, and Gattshall be granted, except as to certain claims under the Kansas Consumer Protection Act in connection with the Slurrystore lease, the claim for breach of implied warranty of merchantability, and the claim for fraudulent misrepresentation.