**Albert WIGHT, et al., Plaintiffs,**

v.

**AGRISTOR LEASING, et al.,
Defendants.**

**Civ. A. No. C–84–4050–S.**

United States District Court,
D. Kansas.

Jan. 6, 1987.

Brock R. Snyder, Topeka, Kan., for plaintiffs.

Turner, Boisseau, Chtd., Lynn Hursh, Overland Park, Kan., for W.E. Turner.

William Hergenreter, Shaw, Hergenreter & Quarnstrom, Topeka, Kan., 4–J Harvestore Systems, Inc.

Gehrt & Roberts-Chtd., Floyd E. Gehrt, Topeka, Kan. (K–W–H–I Co., Inc.) (Donald D. Krause).

Benfer & Farrell, George F. Farrell, Jr., Topeka, Kan., for A.O. Smith Harvestore Products, Inc., A.O. Smith Corporation, Inc.

Lathrop, Koontz, Righter, Glagett & Norquist, Gordon E. Wells, Jr., John L. Vratil, Overland Park, Kan., for AgriStor Leasing, AgriStor Credit Corp. and Steiner Financial Corp.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before the court on various defendants' motions for summary judgment. Defendant AgriStor Leasing has filed a motion for summary judgment on plaintiff's second amended complaint. Defendant A.O. Smith Harvestore Products, Incorporated has also filed a motion for summary judgment. A.O. Smith Corporation, Incorporated has filed a motion for summary judgment. The defendant 4–J Harvestore Systems, Incorporated has also filed a motion for summary judgment and a motion to dismiss. Rather than address each of the individual defendants' motions as a joint motion, the court will individually address the motions of AgriStor Leasing & 4–J Harvestore Products, Inc. The motions of A.O. Smith Harvestore Products, Inc. and A.O. Smith Corporation will be jointly addressed.

The court will first consider defendant AgriStor Leasing's motion for summary judgment. A moving party is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Maughan v. SW Servicing, Inc.*, 758 F.2d 1381, 1387 (10th Cir.1985). An issue of fact is "material" only when the dispute is over facts that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, — U.S. —, —, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). The requirement of a "genuine" issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* Thus, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* The court must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues. *United States v. O'Block*, 788 F.2d 1433, 1435 (10th Cir.1986). The court must also consider the record in the light most favorable to the party opposing the motion. *Bee v. Greaves*, 744 F.2d 1387, 1396 (10th Cir.

1984), *cert. denied*, 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985). The language of Rule 56(a) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, — U.S. —, —, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

For purposes of this summary judgment motion, the following facts are uncontroverted.

1. Defendant AgriStor Leasing is a Wisconsin Partnership composed of AgriStor Credit Corporation, a Delaware corporation, with its principal place of business in Brookfield, Wisconsin and Steiner Financial Corporation, a Utah corporation, with its principal place of business in San Francisco, California. These corporations will be collectively referred to as AgriStor.

2. Plaintiffs Albert and Marian Wight are husband and wife and residents of the State of Kansas. Plaintiffs Jim and Nancy Wight are husband and wife, and son and daughter-in-law of Albert and Marian Wight. At all times relevant to this case, the Wights were engaged in the business of farming.

3. Jim Wight is thirty-nine years old and has been in farming since 1969. Jim and Albert Wight farmed as a partnership until 1984 when Albert retired.

4. Defendant A.O. Smith Harvestore Products, Inc. designs and manufacturers A.O. Smith Harvestore equipment. A.O. Smith Harvestore Products, Inc. [hereinafter AOSHPI] designed and manufactured the equipment at issue.

5. A Harvestore is a large grain-storage silo. This equipment is generally operated in connection with related automation equipment.

6. AgriStor does not design, manufacture or install Harvestore equipment.

7. AgriStor is the lessor of A.O. Smith Harvestore equipment.

8. AgriStor Credit Corporation and AOSHPI are separate, wholly-owned subsidiaries of defendant A.O. Smith Corporation. AgriStor never had and does not presently have a proprietary interest in, agency or representative relationship with AOSHPI. AOSHPI never had and does not presently have a proprietary interest in, agency or representative relationship with AgriStor. AOSHPI is not an agent of AgriStor.

9. At all times relevant to the issue at hand, former defendant K.W. Harvestore, subsequently K–W–H–I Company, Inc. [hereinafter KW] was a dealer engaged in the sale, assembly, installation and service of Harvestores and related equipment.

10. Neither AgriStor nor KW has ever had or does have a proprietary interest in, agency or representative relationship with each other, and neither AgriStor nor KW has ever had nor do they presently have any employee who serves as an officer, agent or employee of the other.

11. Pursuant to the terms of the Dealer Agreement on Leasing, KW was to obtain and forward properly-completed and executed documents which evidenced a lease transaction of Harvestore equipment between AgriStor and its leasing customers.

12. Said Dealer Agreement on Leasing provides in paragraph B(2) that, "Dealer has not made and will not make any agreements, warranties or representations on behalf of AgriStor, and the terms contained in each lease agreement constitute the only under standing between AgriStor and the lessee named therein in connection with the equipment."

13. KW was under no obligation to submit leasing applications to AgriStor, and AgriStor had no obligation to approve any applications that might be submitted for its review by KW. KW was free to use any leasing or financing entity it desired, including but not limited to AgriStor, to lease or sell agricultural equipment to its customers.

14. At all times relevant to the issue at hand, former defendant, Bud Turner, was a salesman of Harvestore equipment for KW.

15. Turner is not now nor has he ever been an officer, agent or employee of Agri-Stor. At no time before, during or after the occurrence of the transactions, which are the subject of this action, did Turner have any authority, either express or implied, to represent himself as an officer, agent or employee of AgriStor or to modify any terms or conditions of the lease between AgriStor and the Wights.

16. At all times relevant hereto, former defendant Don Krause was the owner of KW.

17. Krause is not now nor has ever been an officer, agent or employee of Agri-Stor. At no time before, during or after the occurrence of the transactions did Krause have any authority, either express of implied, to represent himself as an officer, agent or employee of AgriStor or to modify any terms and/or conditions of the lease between AgriStor and the Wights.

18. On or about August 7, 1978, the Wights executed two Customer Purchase Orders for certain Harvestore equipment.

19. Thereafter, AgriStor purchased the equipment listed in said Customer Purchase Orders from KW and leased it to the Wights. On or about August 23, 1978, the Wights executed an Agricultural Equipment Lease Agreement with AgriStor.

20. On or about August 4, 1984, the Wights executed another Customer Purchase Order and the Lease was modified by an addendum.

21. Pursuant to the terms and conditions of the Lease and Addendum, AgriStor leased to the Wights the following described equipment:

1—17A 2588 Harvestore w/Goliath Unloader;
1—17A 2577 Harvestore;
1—400 B.U. Wa-Ro-Matic Mill;
Forage Weigher;
105 Flight Conveyor;
13″ U–Trough and Auger;
Supplement Miller
Related Motors and Controls;

AG 2574 Goliath Unloader;

25' Hood Kit.

22. Pursuant to the terms and conditions of the Lease, the Wights agreed to pay rent to AgriStor in the sum of $25,533.37, due November 1, 1981, followed by five (5) annual payments of $27,888.96 each, commencing on November 1 1982, and continuing through and including November 1, 1986.

23. The purchase Orders provide in paragraph 14, page 2 that:

Buyer understands the conditions of use of the products and is not relying on the skill or judgment of the Manufacturer or Seller in selecting them because Buyer acknowledges that farming and livestock feeding results are very much the product of individual effort combined with various climatic soil, water, growing and feeding conditions which are beyond the control of the Manufacturer and Seller. Buyer recognizes that any advertisements, brochures, and other written statements which he may have read, including any farm profit plan which may have been shown to him, as well as any oral statement which may have been made to his concerning the potential of the Harvestore and/or Slurrystore units and allied machinery and equipment, are not guaranties and he has not relied upon them as such because the products will be under Buyer's exclusive management and control. Buyer understands that the sole warranty, express or implied which is provided by A.O. Smith Harvestore Products, Inc., herein the Manufacturer and/or the Seller is as follows:

WARRANTY OF MANUFACTURER AND SELLER

If within the time limits specified below any product sold under this purchase order, or any part thereof shall prove to be defective in material or workmanship upon examination by the Manufacturer, the Manufacturer will supply an identical or substantially similar replacement part f.o.b. the Manufacturer's factory, or the Manufacturer, at its option, will repair or allow credit for such part. The Seller warrants only that the foundation will be properly installed and that the product will be erected in strict conformance with the Manufacturer's specifications.

24. The Lease provides in Paragraph 4, subsections (1), (2), (3) and (4):

(1) "That THE EQUIPMENT IS OF A SIZE, DESIGN, CAPACITY AND MANUFACTURE SELECTED BY LESSEE, (2) THAT LESSEE IS SATISFIED THAT THE SAME IS SUITABLE FOR ITS PURPOSES, (3) THAT LESSOR IS NOT A MANUFACTURER OR INSTALLER THEREOF NOR A DEALER IN PROPERTY OF SUCH KIND, (4) THAT LESSOR HAS NOT MADE, AND DOES NOT HEREBY MAKE, ANY REPRESENTATION OR WARRANTY OR COVENANT OF ANY KIND WITH RESPECT TO THE EQUIPMENT ..."

25. The Lease also contains, however, a provision in bold red type conspicuously stamped at its top which provides:

NOTICE TO CERTAIN KANSAS LESSEES—

Notwithstanding the terms hereof to the extent prohibited by Kansas law, no exclusion, modification, or limitation herein, of (a) any implied warranty of merchantability or fitness for a particular purpose otherwise applicable to this transaction or any remedy provided lessees by law, including the measure of damages, shall apply to leases made within the State of Kansas where lessee is a natural person or sole proprietorship.

26. The Lease further provides in Paragraph 4 that,

LESSEE ACKNOWLEDGES AND AGREES THAT NEITHER THE SUPPLIER NOR ANY SALESMAN, EMPLOYEE OR REPRESENTATIVE OR AGENT OF THE SUPPLIER IS AN AGENT OR REPRESENTATIVE OF LESSOR AND THAT NONE OF THE ABOVE ARE AUTHORIZED TO WAIVER OR ALTER ANY TERM, PROVISION OR CONDITION OF THIS LEASE OR TO MAKE ANY REPRESENTATION OR WARRANTY WITH RESPECT TO THIS LEASE OR THE

EQUIPMENT. LESSEE FURTHER ACKNOWLEDGES AND AGREES THAT LESSEE, IN EXECUTING THIS LEASE, HAS RELIED SOLELY UPON THE TERMS, PROVISIONS AND CONDITIONS CONTAINED HEREIN, AND ANY OTHER STATEMENTS, WARRANTIES OR REPRESENTATIONS, IF ANY, BY THE SUPPLIER, OR ANY SALESMAN, EMPLOYEE, REPRESENTATIVE OR AGENT OF THE SUPPLIER HAVE NOT BEEN RELIED UPON, AND SHALL NOT IN ANY WAY AFFECT LESSEE'S OBLIGATION TO PAY THE RENT AND OTHERWISE PERFORM AS SET FORTH IN THIS LEASE.

27. The Lease further provides in Paragraph 10 that, "Lessee, at its own cost and expense, shall keep the Equipment in good repair, condition and working order ..."

28. The Lease further provides in Paragraph 4 that:

IF THE EQUIPMENT IS NOT PROPERLY INSTALLED, DOES NOT OPERATE AS REPRESENTED OR WARRANTED BY THE SUPPLIER, OR IS UNSATISFACTORY FOR ANY REASON, LESSEE SHALL MAKE ANY CLAIM ON ACCOUNT THEREOF SOLELY AGAINST THE SUPPLIER. As used in this Lease, the term Supplier shall mean the selling dealer named in the Purchase Order with respect to the · Equipment.

29. K.W. is the selling dealer named in the Purchase Orders.

30. The Lease further provides in paragraph 11 that "The Equipment is, and shall at all times remain, personal property, and title thereto shall remaining Lessor exclusively ...", and in Paragraph 12, that "Upon expiration or termination of this Lease, Lessor or its designee shall have the right to enter upon the property of Lessee where the Equipment is located and to dismantle and remove the Equipment from such property."

31. The Lease further provides in Paragraph 17 that at the end of the term of the Lease, the lessee shall have the option to purchase the equipment for a "purchase price equal to Fair Market Value" of the equipment as of the end of such term, and that the "Fair Market Value" shall be equal to the value which would be obtained in an arm's-length transaction between an "informed and willing buyer-user (other than (i) a lessee currently in possession and (ii) a used equipment dealer) and an informed and willing seller under no compulsion to sell. Such Fair Market Value shall be determined by an agreement between Lessor and Lessee, or, if they cannot agree, by an independent appraiser ..."

32. The Lease further provides in the last full paragraph on page 1 that, "LESSEE HAS READ AND AGREES TO" the Lease. And, in Paragraph 19, that "The Lease shall not be waived, altered, modified, amended, supplemented or terminated in any manner whatsoever except by written instrument signed by Lessor and Lessee."

33. Jim Wight had primary responsibility for the decision to lease the equipment and the decision to enter into the Lease was basically left up to Jim Wight.

34. The Wights prime motivation for acquiring the equipment came from representations from Turner.

35. Turner never told the Wights he was an agent of AgriStor. Jim Wight just assumed that he was.

36. Turner never made any representations as to what AgriStor would do with respect to the equipment or its service.

37. All Turner said about AgriStor was that it was a possible source of financing like a bank. Turner never told the Wights they had to finance the equipment through AgriStor.

38. The Wights had no contact with any representatives of AgriStor until the day they signed the Lease. An AgriStor representative was present at that time, but he simply said the Wights had been approved for credit. He did not make any representations about the equipment or what it would do.

39. Jim Wight read the Lease in its entirety before signing it, and he also discussed the Lease with his banker and accountant before signing it.

40. It is controverted whether AgriStor had any knowledge of any statements or representations which Turner or Krause might have made, which might have had the effect of modifying or altering the express written terms and conditions of the Leases. Plaintiffs do allege that AgriStor representatives attended a sales training seminar for Harvestore products.

41. Any and all sales literature provided by Turner to the Wights in connection with the Lease was produced by AOSHPI.

42. The equipment was delivered, installed and erected by KW on the Wight's property by September 28, 1978.

43. The Wights began using the structures in January, 1979.

44. The Wights first experienced what they perceived to be problems with the unloading of the grain structure in February, 1979.

45. The Wights first experienced problems with the unloading of the forage structure in June, 1979.

46. The Wights never contacted AgriStor prior to the time they filed this lawsuit to advise AgriStor of any problems they were having with the equipment.

47. All requests by the Wights for repairs, service and advice with respect to the Harvestore equipment were made to Turner or other representatives of KW.

48. Jim Wight never understood or believed AgriStor was responsible for servicing the equipment.

49. On or about October 14, 1984, the Wights executed and entered into a Lease Payment Deferral Agreement with AgriStor.

50. Under the terms and conditions of the Lease Payment Deferral Agreement, AgriStor agreed to defer the $27,888.96 past-due amount under the Lease until November 1, 1983, for a deferral fee of $4,043.90, for a total payment due November 1, 1983, of $31,932.86.

51. The Wights made three payments on the Lease. The Wights failed and refused to make the deferred payment due under the Lease Payment Deferral Agreement, and therefore are in default under the terms and conditions of the Lease and the Deferral Agreement.

## CONCLUSIONS OF LAW

The court will first address the pivotal issue of whether the agreement signed by the plaintiffs and AgriStor is in effect a true lease or constitutes a sale. The defendants argue that this agreement is clearly a lease agreement. First, defendants state that the title itself designates the agreement between the parties as a lease agreement. Second, the lease provides in Paragraph 11 that the equipment at all times remains and is titled in the Lessor. It gives the Lessor the right to enter upon the property of the Lessee and remove the equipment upon the expiration of the Lease or upon default. Third, the Lease, while granting to the Lessee a purchase option, requires that the Lessee pay a price equal to the fair market value of the equipment at the expiration of the Lease term. The Lease defines fair market value as an amount equal to the value which would be obtained in an arm's-length transaction between an informed and willing buyer and an informed and willing seller. The Lease further provides that if the fair market value cannot be determined by an agreement between the Lessor and Lessee, an independent appraiser should make such valuation. Defendants therefore argue that the option price at the end of the lease cannot be equated to be a sale, as the lessee is required to pay a substantial purchase price at the end of the lease.

On the other hand, plaintiffs argue that there exists genuine issues of material fact as to whether the parties intended a lease or a sale under this agreement. Plaintiffs specifically contend that the title on the agreement is not controlling as to whether it is a lease or a sale. The court must

agree. Rather, it is the parties' intentions which control. Specifically, plaintiffs contend that a material issue of fact exists as to whether the plaintiffs could purchase the equipment for a nominal consideration at the end of the lease term. Plaintiffs contend that it was represented to Jim Wight that he would be able to exercise the purchase option for a nominal fee. Plaintiffs also cite to the fact that the lessee is to assume responsibility for obtaining necessary licenses, titles, permits, and taxes and maintenance costs, thus negating this agreement as a true lease. Finally, plaintiffs contend that the agreement between the plaintiffs and AgriStor Leasing is an installment sale because the only sensible course of action for the Wights was to exercise the purchase option at the end of the lease term. Plaintiffs contend that the Lease Agreement between the parties was to run for an eight-year period, at the end of which total rentals would equal $198,-258.88. Thus, the only sensible course of action for the lessee to take was to exercise the option after investing such a sum in the equipment. The plaintiffs contend that since the fair market value cannot be determined at this point, there exist genuine issues of material fact as to the meaning of fair market value and whether this figure would represent a nominal or substantial amount necessary to purchase the equipment.

In reply, defendants state that there are no material issues of fact which exist. Defendants cite to cases which hold that if the option price is roughly equivalent to the fair market value of the property at the time of the exercise of the option, the purchase price is not nominal and the agreement is a true lease. In support of its argument that there are no material issues of fact, the defendant, AgriStor Leasing, attached an affidavit by Mr. Latta. Mr. Latta is the credit manager for AgriStor Credit Corporation, a general partner in AgriStor Leasing. In his affidavit, Mr. Latta states that AgriStor Leasing has regularly leased Harvestore systems similar to that used by the Wights for ten and twelve year terms with an additional option to renew for five more years, thus inferring that Harvestore systems clearly have a life in excess of the eight-year lease term between the plaintiffs and the defendants, and negating plaintiff's contentions that the option price is a nominal price.

In reviewing the case law to determine whether the option to purchase the equipment at the expiration of the lease for a price equal to the "fair market value" is a nominal amount or a substantial amount, the court is guided by the decision in *Agri-Stor Leasing v. Meuli*, 634 F.Supp. 1208, 1214 (D.Kan.1986). In that case, the Honorable Patrick F. Kelley determined that an option to purchase for "fair market value" is not nominal. The court based its decision on the fact that while the term of the lease was eight years, the title remained with the lessor at all times. In addition, the lessor had the control and the ability to remove the equipment at the end of the lease period. The court further based its decision on the fact that a useful life of a Harvestore is over fifteen years, and that an option to purchase at the end of the eight years for the fair market value is not a nominal purchase price. *Id.* at 1214–1215 (citing *In the Matter of Bill Mayron Marsh*, No. 11090 (Bankr.Ct.Ind., Jan. 7, 1983) (unpublished)). The court found that regardless of the provisions in the agreement which provided that the lessee had to provide insurance, make repairs and pay taxes, the court found on the balance that the agreement was a true lease, rather than a sale, according to Kansas law. *Id.* at 1215.

The court notes that the plaintiffs cited the decision in *In re International Plastics, Inc.*, 18 B.R. 583 (Bankr.D.Kan., 1982) for the proposition that a material issue of fact exists as to whether fair market value can be equated to be a nominal versus a substantial cost. In the *In re International Plastics, Inc.* decision, the court found, however, that a purchase option would be considered nominal and reasonably anticipated where the option price was less than the fair market value. *Id.* at 587. In that decision, the court determined

that the agreement was a true lease and was not intended as a security agreement. In *In re International Plastics,* the purchase price of the property at the end of the lease term was equal to the fair market value of the property. The court therefore finds the decision cited does not adequately support plaintiffs' position that because the actual fair market value is unknown at this time, summary judgment is precluded. Rather, the court finds that the *In re International Plastics* decision supports a finding that the purchase option in the lease at issue, providing that the lessee may pay an amount equal to the fair market value, is not nominal consideration.

K.S.A. § 84–1–201(37) also provides a guide in defining whether a lease is intended to be a true lease or a security agreement.

Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance of the terms of the lease, the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration, does make the lease one intended for security.

Using our earlier factual finding, the court determines that under the definition of K.S.A. § 84–1–201(37), this agreement is a true lease rather than a security agreement. The court finds that the option to become the owner of the property cannot be fulfilled for a nominal or no additional consideration. The court therefore finds that the agreement between the plaintiff and AgriStor Leasing is a true lease, and does not constitute a sale.

The court will first address plaintiffs' claim against AgriStor Leasing for breach of an implied warranty. K.S.A. § 84–2–314 provides that a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Defendants argue that Article 2 is limited to sales, defined as "passing of title from the seller to the buyer for a price" (citing K.S.A. § 84–2–106(1)). The defendants contend that since the lease at issue is a true lease, it is not subject to Article 2 warranties. Plaintiffs state in opposition to defendants' contention that this agreement should be construed as a sale of goods. Alternatively, plaintiffs argue that where there exists a "close alignment" of the manufacturer, dealer and lessor, the Kansas courts would hold the lessor liable for Article 2 warranty liability.

Plaintiffs argue that the relationship of the parties in this case mandates a finding that AgriStor Leasing be held liable for implied warranty of merchantability. In support, plaintiffs cite to the fact that AgriStor Leasing is a partnership consisting of general partner, AgriStor Credit Corporation and Steiner Financial Corporation. AgriStor Credit Corporation is a wholly-owned subsidiary of A.O. Smith and holds and 80% partnership interest in AgriStor Leasing. Plaintiffs further cite to the fact that AgriStor Credit Corporation's one purpose is to finance agricultural equipment manufacturer primarily by A.O. Smith Harvestore Products. Plaintiffs contend that AgriStor Leasing is also closely aligned with many of the dealers, and that many of these dealers, such as KW, act as agents for AgriStor Leasing in explaining, preparing and transmitting credit application, and also in the repossession and dismantling of Harvestore silos when the purchaser is in default. Plaintiffs argue that AgriStor Leasing is well aware of the business practices of dealers, based on the extensive dealings with each over a long period of time. Plaintiffs contend that AgriStor is not an independent financing agency such as those financing agencies cited in the decision by the defendants in support of their motion.

The court notes that the plaintiffs have cited the decision in *Global Tank Trailer Sales v. Textilana-Nease, Inc.,* 209 Kan. 314, 496 P.2d 1292 (1972) for the proposition that implied warranty of fitness for a particular purpose is applicable in a true

lease or bailment when the defect is discoverable. The court finds that the court's ruling in that case can be distinguished from the case at hand. The court in *Global Tank Trailer Sales* found that the bailment at issue in that case was for the mutual benefit of both the bailor and the bailee and that while the bailor was not an absolute insurer against injuries from a defective chattel in that the bailor clearly knew of the defects in the truck.

■ The court notes that in a similar case, *AgriStor Leasing v. Meuli*, 634 F.Supp. 1208, 1220–21 (D.Kan.1986), the court found that AgriStor was a finance lessor and not a "merchant" under K.S.A. § 84–2–314. Thus, the court found that AgriStor had breached no implied warranties and was entitled to summary judgment on the issue. The court initially determines, based on the record at hand and the case law in this area, that AgriStor Leasing is not a merchant under K.S.A. § 84–2–314, and cannot be held liable for breach of implied warranty of merchantability. The court will next address plaintiffs' contention that the close relationship between the parties mandates that AgriStor Leasing be held liable for breach of implied warranty based on their agency relationship and their close alignment with the dealer and manufacturer.

■ In reviewing the uncontroverted facts, the court is not convinced that the dealer or manufacturers acted as AgriStor's agents. In *CIT Financial Services, Inc. v. Gott*, 5 Kan.App.2d 224, 229, 615 P.2d 774, the court held that the party relying on the relationship between the parties has the burden of establishing the agency existence by clear and satisfactory evidence. *Id.* at 230, 615 P.2d 774. In *CIT Financial Services*, the court found that there was no agency relationship between the parties. The court found CIT did not have a voice in setting the policies and standards to be followed by a dealer as it had exercised no control whatsoever over the business affairs of the dealer. The court further found that the dealer did not have to finance the purchase with funds provided by CIT. In addition, CIT, after financial forms were filled out, still had the option whether to provide funds for purchase or not. The court finally found that CIT's only rule in the transaction was to provide funds with which purchase was to be made, and the only buyer-seller relationship which existed was between the dealer and the buyer, and not the financing agency. In *CIT Financial Services*, the court concluded because there was no buyer-seller relationship between CIT and the buyer, the warranty provisions of Article II of the UCC are not applicable to CIT.

This court finds the facts of *CIT* very similar to the case at hand. The uncontroverted facts demonstrate AgriStor did not design, manufacturer or install Harvestore equipment. The facts further indicate that defendant K.W. Harvestore, subsequently K–W–H–I Company, Inc. was a dealer engaged in the sale, assembly, installation and service of Harvestores. Neither AgriStor nor KW had ever had an employee who served as an officer, agent or employee of the other. Pursuant to the terms of the dealer agreement on leasing, KW was to obtain and forward completed, executed documents which evidenced a lease transaction between AgriStor and KW's customers. The agreement on leasing specifically provided that the dealer had not made any agreements, warranties or representations on behalf of AgriStor. An important factor in the court's consideration is the fact that KW was under no obligation to submit leasing applications to AgriStor nor did AgriStor have any obligation to approve any applications. KW was free to use any leasing or financing it desired. Former defendant Bud Turner was a salesman of Harvestore equipment for KW but had never been an officer, agent or employee of AgriStor. Don Krause, the owner of KW, was not an officer, agent or employee of AgriStor.

Plaintiffs cite to the fact that AgriStor Credit Corporation had only one purpose, which was to finance the sale of agriculture equipment manufacturer by A.O. Smith Harvestore Products, Inc. The court

finds that this factor alone does not establish an agency relationship. Plaintiffs further argue, however, that KW and AgriStor Leasing had a financial agreement and working relationship whereby his customers would utilize AgriStor Leasing to finance the purchase of Harvestore silos. The court finds that the deposition of Don Krause does not convince this court that KW and AgriStor Leasing had such a relationship which would mandate a finding that KW was an agent for AgriStor Leasing and thus AgriStor Leasing would be liable for any implied warranty of merchantability. The court therefore finds that AgriStor Leasing's motion for summary judgment for breach of implied warranty of merchantability is hereby granted.

■ The court finds that it can summarily dismiss plaintiffs' claim against AgriStor Leasing for breach of express warranty of merchantability. Under K.S.A. § 84–2–313, any affirmation of fact or promise made by the seller to a buyer or any description of the goods which is made part of the basis of the bargain creates an express warranty. Defendant seeks summary judgment for this claim on the basis that the lease contains no written warranties, and specifically provides that it has not made and does not make any representation or warranty or covenant of any kind with respect to the equipment. *See* Paragraph 4 of the Lease Agreement. Further, AgriStor Leasing states that it has made no oral warranties. There are no facts which establish that the Wights had any contact with anyone from AgriStor Leasing until the day they signed the lease.

The court finds that this factual scenario is similar to the facts in the decision of *AgriStor Leasing v. Meuli,* 684 F.Supp. 1208, 1219 (D.Kan.1986). In that case, the court found that since AgriStor never dealt directly with the plaintiffs in their decision to lease, it could not be held liable for breach of express warranties. The court further found that the only other theory upon which AgriStor could be held liable for breach of express warranty is under an agency theory. As the court has previously determined that no such relationship existed, AgriStor is also entitled to summary judgment on plaintiffs' claim for express warranty as alleged in plaintiffs' second amended complaint.

■ The court further finds that defendant AgriStor Leasing should be granted summary judgment on plaintiffs' claim for implied warranty of fitness for a particular purpose, pursuant to K.S.A. § 84–2–315. K.S.A. § 84–2–315 specifically mandates that the seller must know at the time of contracting a particular purpose for which the goods are required. As the court previously found that AgriStor Leasing did not have any contact with the plaintiffs until the day the lease was signed, AgriStor Leasing cannot be held liable for damages under this theory.

■ Plaintiffs have also brought a claim against AgriStor Leasing for an alleged violation of the Kansas Consumer Protection Act. Plaintiffs specifically allege that AgriStor Leasing attempted to improperly disclaim implied warranties and limit remedies available to the Wights. The court finds that summary judgment in favor of the defendants must be granted on this claim. The court notes that the lease specifically provides in the language contained at the top of Page 1 that any warranties required by law are resurrected. The specific language states:

> NOTICE TO CERTAIN KANSAS LESSEES—Notwithstanding the terms hereof, to the extent prohibited by Kansas law, no exclusion, modification, or limitation herein of any implied warranty of merchantability or fitness for a particular purpose otherwise applicable to this transaction, or any remedy provided lessee by law, including the measure of damages, shall apply to leases made within the state of Kansas, where lessee is a natural person or a sole proprietorship.

The court finds this language clearly negates any alleged unlawful warranty disclaimer.

The plaintiffs also allege that AgriStor committed certain unconscionable and deceptive acts in violation of the Kansas Consumer Protection Act. Specifically, they claim that there were certain misrepresentations made to them as to the benefits and characteristics of the Harvestore system. Plaintiffs further claim that the parties to this agreement are at a disparity as to their bargaining power. Plaintiffs contend that the lease agreement signed is a standard printed form in which the plaintiffs had no choice but to agree to the terms. Therefore, plaintiffs claim that the disparity of bargaining power, coupled with a contract which disclaims warranties and limits penalties and contains penalty clauses, should be considered unconscionable.

In reply to plaintiffs' arguments, defendants note that Jim Wight's deposition clearly demonstrates that Jim Wight read the lease in its entirety and discussed said lease with his banker and accountant before signing. Thus, Mr. Wight cannot be characterized as an unsophisticated consumer. The defendants also contend that the plaintiffs had a choice in obtaining financing through some other means, as they were not required to finance through AgriStor. Defendants also contend that the notice stamped on Page 1 of the lease, negating any disclaimers of warranties, further weakens plaintiffs argument.

■ In reviewing the record and the case law applicable to this issue, the court finds that defendants' motions for summary judgment on plaintiffs' claims pursuant to the Kansas Consumer Protection Act should be granted. In support, the court notes the decision in *CIT Financial Services, Inc. v. Gott*, 5 Kan.App. 224, 231, 615 P.2d 774 (1980). In that case, the court found that since there was no buyer-seller relationship between the parties, the warranty provision of Article 2 of the UCC did not apply. Stemming from that finding, the court then held that disclaimers of warranties could not be found to unconscionable pursuant to K.S.A. § 84–2–302.

The court finds further support in the fact that AgriStor had no specific dealing with the plaintiffs until the actual lease agreement was signed. In *Wille v. Southwestern Bell Telephone Company*, 219 Kan. 755, 758–59, 549 P.2d 903 (1976), the court discussed in detail the doctrine of unconscionability. The court recognized that the doctrine of unconscionability is difficult to define. The court recognized that other courts have identified a number of factors used to determine the applicability of the doctrine to a given set of facts. These factors include:

(1) the use of printed form or boilerplate contracts drawn skillfully by the party in the strongest economic position, which establish industry-wide standards offered on a take-it-or-leave-it basis to the party in a weaker economic position (cites omitted);

(2) a significant cost-price disparity or excessive price;

(3) a denial of basis rights and remedies to a buyer of consumer goods (cites omitted);

(4) the inclusion of penalty clauses;

(5) the circumstances surrounding the execution of the contract, including its commercial setting, its purpose and actual effect (cites omitted);

(6) the hiding of clauses which are disadvantageous to one party in a mass of fine-print trivia or in places which are inconspicuous to the party signing the contract (cites omitted);

(7) phrasing clauses in language that is incomprehensible to a layman or that divert his attention from the problems raised by them or the rights given up through them;

(8) an overall imbalance in the obligations and rights imposed by the bargain;

(9) exploitation of the underprivileged, unsophisticated, and uneducated and the illiterate (cites omitted); and

(10) inequality of bargaining or economic power.

*Id.* at 758–59, 549 P.2d 903. The court recognized however that the mere disparity of bargaining strength, without more, was not enough to make out a case of uncon-

scionability. The court found that the intent of the doctrine of unconscionability is to curb excesses of certain parties who abuse their right to contract freely. It is not used to punish the consequences of unequal bargaining power or even a simple, old-fashioned bad bargain.

Applying these factors to the record at hand, the court finds that the lessor was obviously in a stronger economic position in which to deal. The court finds that there is no evidence that there was a significant cost-price disparity or excessive price. Thus, the second factor is not evident. While the court does recognize that Paragraph 4 of the lease agreement did state that the lessor does not make any representation or warranty as to the durability or suitability of the equipment, or any other warranty or covenant of any kind, and limits the lessor's liability, the notice on Page 1 of the lease negates any disclaimer of warranties that might be applicable.

The court does note, however, paragraph 4 provides that any breaches of warranty or any representations made shall not affect the lessee's obligation to pay the rent and otherwise perform the lease. It further provides that if the equipment is not properly installed or does not operate as represented or warranted by the supplier, or is unsatisfactory for any reason, the lessee is limited to make a claim on account thereof solely against the supplier. The court cannot find that these provisions, especially in light of the language stamped on the front of the lease which resurrected such warranties, mandate a finding of unconscionability.

The court notes that the lessee still had the right to bring a cause of action for any breach of warranties or unsuitability of the equipment against the supplier. The court finds that these provisions were clearly marked in the lease agreement and were not hidden in fine print so that the plaintiffs signing the contract would be misled or would overlook such provisions. The court further finds that this language in the lease agreement is not so incomprehensible that the plaintiffs would sign the lease agreement without fully comprehending their rights. The court considers significant the fact that Jim Wight consulted both his banker and accountant before signing the lease. This negates any finding that the lessor sought to exploit an unsophisticated consumer by the use of the lease agreement. The court further finds that this fact negates any support for the finding of a vast disparity in bargaining power.

Another important factor which must be considered is the fact that the plaintiff had an option of financing the purchase of this equipment through other means but chose, after consulting his banker and accountant, to enter into a contract with AgriStor Leasing. As state courts have held, the Kansas Consumer Protection Act should not be applied based on unequal bargaining power, or based on a badly-worded contract. The court finds that the Kansas Consumer Protection Act was not enacted to eradicate all badly-worded contracts or contracts that are unreasonable or which may lead to hardship on one side. *See Wille v. Southwestern Bell Telephone Co.*, 219 Kan. at 762, 549 P.2d 903 (action should only be brought when the enforcement of the terms of the contract are so unconscionable that no decent, fair-minded person would view the ensuing result without being possessed of a profound sense of injustice). While the court recognizes that the contract could be construed to be drawn most favorably to the lessor, that in and of itself does not establish a claim for unconscionability under the Kansas Consumer Protection Act. Under the standards enunciated in rendering a decision on a motion for summary judgment, the court finds that the plaintiffs have not established the sufficient elements to bring a claim under the Kansas Consumer Protection Act. The court therefore finds that defendant AgriStor Leasing's motion for summary judgment on plaintiffs' claim under the Consumer Protection Act should be granted.

■ Defendants also seek summary judgment on plaintiffs' claim against AgriStor Leasing for strict liability and negli-

gence. In ruling on this issue, the court finds the decision in *AgriStor Leasing v. Meuli*, 634 F.Supp. 1208, 1216–17 (D.Kan. 1986) controlling on this issue. In that decision, the court found that while § 402A of the Restatement (Second) of Torts has been applied to commercial lessors, Agri-Stor Leasing should be considered to be a finance lessor, and thus not liable for strict liability. The court found that AgriStor is not the only member of the marketing chain available to the plaintiff for recovery. In addition, the court held that AgriStor Leasing had no special expertise with respect to the goods and that AgriStor had no direct involvement with the design, manufacture or installation of the equipment. *Id.* at 1216–1217. The court finds that a review of the facts in this case establish that the basic policy reason underlying the creation of strict liability would not be furthered by imposition of strict liability upon AgriStor Leasing. The basic intent of the doctrine of strict liability is to protect consumers from those who are directly responsible for placing the products in the market. The court finds that such is not the case here. AgriStor Leasing did not enter into a transaction until after the plaintiffs had made a decision to purchase the equipment. AgriStor Leasing acted only as a financier and made no representations as to the quality of the equipment itself. Thus, AgriStor Leasing's motion for summary judgment on plaintiffs' claim under strict liability should be granted.

■ Similarly, the court finds that Agri-Stor Leasing should be granted summary judgment on plaintiffs' claim against them for negligence. The plaintiffs claim that AgriStor negligently breached a duty owed to them to provide field assistance to repair and service the equipment if it failed to operate. The court finds that the language of the lease itself is directly contrary to plaintiffs' contention. Paragraph 4 of the lease clearly provides that if equipment does not operate as warranted, the lessee shall make any claim solely against the supplier. The court therefore finds that the lease itself negates any duty that Agri-Stor Leasing would have to the plaintiffs

as to repair or servicing of the equipment. The court further finds that AgriStor Leasing had no involvement in the design, manufacture or construction of the equipment in question and made no representations as to the quality, and should not be liable for a duty to see that alleged design, manufacture and construction defects associated with the equipment were corrected prior to sale to the plaintiffs. Thus, there was no breach of duty to the plaintiffs and Agri-Stor cannot be held liable for negligence.

■ The court finds that it can summarily dismiss plaintiffs' claims against *all* defendants for usury. The court finds that based on its finding that the agreement entered into by the parties was a true lease versus a sales transaction, the usury laws have no application to the present case. The case law is clear that the usury laws were enacted to prevent excessive rates of interest being charged consumers. Because of the determination in this case that the agreement constituted a lease rather than a sale, and that plaintiffs paid no interest, there is no violation of the usury laws pursuant to K.S.A. § 16–201 *et seq. See AgriStor Leasing v. Meuli*, 634 F.Supp. at 1216.

In *AgriStor Leasing v. Markley*, No. 81–4163 (D.Kan., *unpublished*, May 21, 1986), the Honorable Richard D. Rogers found that plaintiffs' claim for usury could be dismissed on other grounds. The court found that Kansas usury laws do not apply to transaction for business or agricultural purposes. Slip op. at 5 (citing K.S.A. § 16–207(f)). The court noted that although this exemption did not exist at the time of the lease transaction, the general rule of law is that the repeal of a usury remedy operates retrospectively to validate a transaction which was usurous when executed. *Id.* at 5–6 (citing *Orden v. Crawshaw Mortgage & Investment Co.*, 109 Cal. App.3d 141, 167 Cal.Rptr. 62, 64 (1980)). The court therefore finds that the case law mandates that we dismiss plaintiffs' claim for usury as to *all* defendants.

The plaintiffs also have brought claims against AgriStor Leasing for fraudulent and negligent misrepresentations made to them as to what the equipment would do and as to service which would be provided. In reviewing the facts, it is clear that plaintiffs have not properly alleged facts which would support a claim for misrepresentation or fraud. It is uncontroverted that AgriStor Leasing made no representations as to the quality of the equipment, what services the dealer would provide, nor did it have any contact with the plaintiffs prior to the signing of their lease agreement. The court further finds that Paragraph 4 of the lease further negates any liability of such a claim. Paragraph 4 provides that the lessee, in signing the lease, relied only upon the terms contained therein, not upon any statements or promises made by any person. The court further finds that based on its earlier ruling that there existed no agency relationship between William Turner, Don Krause or K.W. Harvestore and AgriStor Leasing, the representations of these defendants cannot be imputed to AgriStor Leasing. The court therefore finds that plaintiffs have not established the elements necessary to bring a claim for fraudulent or negligent misrepresentation. The court therefore finds that AgriStor Leasing's motion for summary judgment on plaintiffs' claims against it should be granted.

## 4-J HARVESTORE SYSTEMS, INC.'S MOTIONS

The court will next address 4-J Harvestore Systems, Inc.'s [hereinafter 4-J] motion for summary judgment and motion to dismiss. For purposes of the motion to dismiss and motion for summary judgment, the following facts are uncontroverted.

1. 4-J was brought into this case by an amended complaint filed April 29, 1985, incorporating the allegations of the original complaint.

2. 4-J was not involved in the sale of any of the equipment which is the subject of this action.

3. Plaintiffs make no claim that 4-J made any express warranties at the time of the sale in question.

4. 4-J neither manufactured, sold, nor leased any of the equipment which is the subject of this action.

5. Plaintiffs do not contend that 4-J violated the Kansas usury laws.

6. 4-J was in no manner involved in the design or manufacture of the equipment at issue.

7. Plaintiffs claim that 4-J violated K.S.A. § 50–627(b)(3) of the Consumer Protection Act.

8. Plaintiffs claim that 4-J, as a wholly-owned subsidiary of A.O. Smith Harvestore Products, Inc. knew, or should have known that the service it provided would be ineffective.

9. Plaintiffs contend that 4-J was guilty of making fraudulent statements and misrepresentations because it knew of the long-standing problems involving the unloader and unloading rate associated with the Harvestore system, and did not so inform the plaintiffs.

10. Interrogatory answers received by 4-J from the plaintiffs on March 19, 1986, state that the theories upon which the plaintiffs rely are based on the fact that 4-J is in the business of running failing Harvestore dealerships. 4-J ran K–W Harvestore under the latter's name from March, 1980 to August, 1983, using the same employees, billing under K–W's name, and taking over the same location and assets. The interrogatory answer further states that 4-J affirmed representations made by K–W and that employees and agents of 4-J undertook the duty to repair plaintiffs silo and failed to alleviate the problems associated with unloading. 4-J was a wholly-owned subsidiary of AOSHPI. 4-J operated dealerships throughout the U.S. and had notice of the problems associated with the Harvestores. Employees of 4-J totally failed to recognize or admit that unloading problems were attributable to defects within the structure.

11. The equipment which is involved in this action was acquired by the plaintiffs in 1978 from K.W. Harvestore Systems, Inc.

12. On February 1, 1980, plaintiffs were supplied with information that a change in ownership, or name, of the local K.W. Harvestore dealership had occurred. Jim Wight has since become aware that it changed from K.W. to 4–J. 4–J operated the dealership until August, 1983.

13. Plaintiffs purchased two (2) Harvestore silos.

14. During the period from February 1, 1980 through the middle of May, 1983, plaintiffs requested service from 4–J. Most all of their service calls concerned the unloading, or rate of unloading, from the structures.

15. From the start, plaintiffs had unloading problems with both structures.

16. 4–J put a new unloader in the grain structures in early 1980. After that, plaintiffs had no unloading problems with the grain structures.

17. Plaintiffs had unloading problems with the forage structures from the very beginning and the problem was present in 1980 when 4–J took over.

18. From time to time, plaintiffs called on 4–J to help with the forage unloading problem. Nineteen items pertaining to service calls were all related to unloading problems. Service calls for 1983 and 1984 were all related to unloading problems with the forage structure. The unloading problem with the forage structure was never solved. In addition to the unloading, plaintiff had other minor problems that 4–J took care of. This repair work done by 4–J was found to be satisfactory.

19. Plaintiffs claim net extra costs for using Harvestore silos amounted to $481,-691.00.

20. A dispute developed over the amount of money to be paid when the auger in the grain structure was installed, but the issue was compromised.

21. 4–J is a wholly-owned subsidiary of AOSHPI, the designer and manufacturer of the products that are the subject of this. It was incorporated in Nebraska in 1969. Its sole purpose for existence and its sole function since its incorporation has been to conduct Harvestore sales operations in areas where no dealer is functioning. At no time during its existence has 4–J been involved in the manufacturing or designing of Harvestore products, and at no time has 4–J participated or been involved in promoting the sale of Harvestore products, except as a local dealer conducting and promoting sales in the same manner as other local Harvestore dealers. 4–J has at all times observed corporate formalities. 4–J took over the Nevada, Missouri, dealership from K–W on February 1, 1980, and operated the facility until August 1, 1983.

22. The silos which are the subject of this action are designed to store livestock feed, both grain and forage. They are loaded from the top and unloaded at the bottom.

23. Plaintiffs have dismissed their action against K–W Harvestore, Turner, and Don Krause, and K–W–H–I Company, Inc.

## CONCLUSIONS OF LAW

The court recognizes that one basis upon which plaintiffs seek to impose liability on 4–J Harvestore Systems is the doctrine of successor-liability. The court notes, however, that the plaintiffs, in opposition to 4–J's motion, did not meet the burden of proving that material issues of fact exist as to 4–J's liability as a successor-corporation. The second basis upon which plaintiffs bring their action against 4–J is their assumption that 4–J knew of the defects in the equipment and concealed them. Again, plaintiffs proffer no evidence, affidavits or documents which support their claims against 4–J. As the court earlier held, the language of Rule 56(A) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of all elements essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, —— U.S. ——, ——–——, 106 S.Ct. 2548, 2550–53. As

the court in *Celotex* said, the principal purposes for the summary judgment motion is to isolate and dispose of factually unsupported claims, and the court's interpretation of Rule 56 accomplishes this purpose. *Id.* at ——, 106 S.Ct. at 2552. In conclusion, the court finds that the plaintiffs have not gone beyond the pleadings and by affidavits, depositions, answers to interrogatories, have not designated specific facts showing that there is a genuine issue for trial. The court therefore finds that defendant 4–J Harvestore Systems, Inc.'s motion for summary judgment should be granted. The court will address each of plaintiffs' claims against 4–J separately.

■ The court previously found that plaintiffs' claim for usury cannot be supported by law and thus the court summarily grants summary judgment on plaintiffs' claim for usury. The plaintiffs also make claims against 4–J for negligence and for gross and wanton conduct. The court finds that the decision in *AgriStor Leasing v. Meuli,* 634 F.Supp. 1208, 1217–18 (D.Kan. 1986), extensively discussed the issue of plaintiffs' claim for strict liability and negligence. In *AgriStor Leasing v. Meuli,* as in this case, the plaintiffs brought suit for damages because of the alleged failure of the defendants' cattle to gain weight and the alleged premature spoilage of grain. The court ruled that these types of damages are economic losses—not property damages recoverable under strict liability. Without reiterating the full discussion by the court in *Meuli,* the court finds that plaintiffs are seeking to recover for economic loss—more a loss of the benefit of the bargain and not an unexpected loss to person or property. The court finds that current case law holds that economic losses in Kansas are not recoverable in a strict liability action. The court therefore finds that plaintiffs' claim against 4–J for strict liability are not supported by law. Likewise, the court finds the lost weight of cattle and the spoilage of the grain are nonrecoverable under any tort theory. Thus, the 4–J motions for summary judgment on the claims of strict liability and negligence are granted.

■ In resolving the other claims against 4–J, the court finds it must examine the doctrine of successor-liability. The general rule on the liability of a transferee's corporation for the prior debts or the liabilities of a transferor and the exceptions were stated in *Kansas Commission on Civil Rights v. Service Envelope Co.,* 233 Kan. 20, 25, 660 P.2d 549 (1983). In that case, the court stated:

> Generally, where one corporation sells or otherwise transfers all of its assets to another corporation, the latter is *not* liable for the debts and liabilities of the transferor, except: (1) where the purchaser expressly or impliedly agrees to assume such debts; (2) where the transaction amounts to a consolidation or a merger of the corporation; (3) where the purchasing corporation is merely a continuation of the selling corporation; or (4) where the transaction is entered into fraudulently in order to escape liability for such debts.

*Id.* (emphasis added) (citing *Comstock v. Great Lakes Distributing Co.,* 209 Kan. 306, 310, 496 P.2d 1308 (1972)). In reviewing the exceptions, the court finds that the only possible applicable exception would be exception (3), if 4–J was merely a continuation of K–W Harvestore, Inc. The court finds that the record is not clear whether 4–J Harvestore Systems, Inc. was merely a continuation of K–W Harvestore, Inc. until it could be sold. Regardless, the court finds that plaintiffs have established no facts which demonstrate that 4–J breached any express or implied warranties. The court further notes that the agreement between the dealer K–W and the plaintiffs specifically limited warranties, either express or implied, to one (1) year after the date of the installation completion report. Clearly, 4–J cannot be held for breach of warranty two years after installation of the equipment on plaintiffs' property. As the court stated in *AgriStor Leasing v. Meuli,* 634 F.Supp. at 1219, if the modification or exclusion of an express warranty is contained in a written expression between the

parties, any prior oral warranty becomes ineffective. The purchase order here clearly limited express warranty to one year. Therefore, 4–J, even under the doctrine of successor-liability, could not be liable for breach of express warranties. The court therefore finds that defendant 4–J's motion for summary judgment on the warranties claim should be granted.

The plaintiffs have also brought a claim against 4–J for breach of implied warranty of merchantability. K.S.A. § 84–2–314 states that in a contract for sale, it is implied that the goods will be merchantable. K.S.A. § 84–2–316(2) provides, however, that to exclude or modify an implied warranty of merchantability, the language of the contract must mention merchantability and in the case of overriding, it must be conspicuous. The statute further provides that language to exclude all implied warranties of fitness is sufficient if it states, for example, that "there are no warranties which extend beyond the description on the face hereof." The court finds that the second disclaimer of warranties in the agreement clearly excludes warranties for merchantability and fitness for a particular purpose. The court finds that the Kansas statutes do not prohibit the dealer from making such exclusion or modifications. As K–W was legally able to disclaim warranties, the court finds that 4–J could not be held liable for breach of implied warranties as a successor-corporation. The court therefore finds that defendant 4–J's motion for summary judgment on plaintiffs' claims for breach of implied warranties should be granted.

Plaintiffs also claim that 4–J violated K.S.A. § 50–627(b)(3), which provides that: "When the consumer transaction was entered into, the consumer was unable to receive a material benefit from the subject of the transaction." For this violation, the plaintiffs seek civil and statutory penalties. The court in *AgriStor Leasing v. Meuli*, 634 F.Supp. 1208, determined that an action pursuant to K.S.A. § 60–514(3) for a civil penalty shall be brought within one year. The court further determined that an action brought for private remedies must be

brought within the three year statutory period pursuant to K.S.A. § 60–512(2). The court therefore must reject plaintiffs' arguments that the five-year statute of limitations in K.S.A. § 60–511 should apply.

In reviewing the deposition of Jim Wight, the court notes that Mr. Wight states that he first observed problems with the equipment or had any complaints concerning the operation of the units in February of 1979. The facts also indicate that after 4–J put a new unloader in the grain structure in early 1980, plaintiffs had no unloading problems with the grain structures. Therefore, the plaintiffs can bring no claim against 4–J regarding the unloader. It is also clear from Jim Wight's deposition that the forage unit did not begin having problems until the summer of 1979. The plaintiffs contend that the rate of unloading was much lower than expected. Clearly, plaintiffs cause of action under K.S.A. § 50–627(b)(3) accrued prior to the statutory period stated above. The court therefore finds that even if 4–J could be found liable due to the doctrine of successor-liability, the court finds that such claims are barred, as the action was not brought within the one-year statutory period for civil penalties, and the three-year statute of limitations for a private remedy. Thus, the court finds that defendant 4–J Harvestore Systems, Inc.'s motion for summary judgment on plaintiffs' claims under the Kansas Consumer Protection Act are hereby granted. The court further finds that plaintiffs' claim against 4–J for breach of contract also has no merit. The plaintiffs have proffered no facts which establish that 4–J in any way breached their service agreement. The uncontroverted facts clearly demonstrate that each time plaintiffs requested service, 4–J completed the service requested. The uncontroverted facts also establish that the plaintiffs were satisfied with 4–J's service. The facts indicate that 4–J did replace the unloader and there were no further problems with the unloading. Any other repair work requested by the plaintiffs was done satisfactorily by 4–J. The court therefore finds that

defendant 4–J's motion for summary judgment on plaintiff's breach of contract claim is hereby granted.

The last claim upon which plaintiffs seek damages from the defendant 4–J is for fraud. Plaintiffs claim that 4–J knew of the design defect and concealed such defect, thus 4–J should be liable for fraud and concealment. Defendant argues that even assuming this to be true, the plaintiffs do not establish that 4–J was under a duty to so inform the Wights. The court finds that the record has not been clearly developed by the plaintiffs to enable the court to find that plaintiffs have established the elements for fraud by clear and convincing evidence justifying the denial of 4–J's motion. *See Anderson v. Liberty Lobby, Inc.,* — U.S. —, — – —, 106 S.Ct. 2505, 2509–12, 91 L.Ed.2d 202 (1986).

■ The court finds that conceivably by virtue of the service agreement, duty could have been imposed upon 4–J to disclose the fact that the silos were defectively designed. The court finds that under the law, a duty may arise from a relationship existing between the parties when the suppression or concealment of some fact is alleged to have occurred. *See DuShane v. Union National Bank,* 223 Kan. 755, 760, 576 P.2d 674 (1978). The court finds, however, that, in reviewing the record at hand, there has been no evidence proffered by the plaintiffs to establish that there existed the alleged relationship and corresponding duty which would subject 4–J to liability for fraudulent concealment. The court further finds there was no evidence which demonstrates that 4–J told the plaintiffs that they could fix the problems the plaintiffs were encountering, when they knew or should have known that the problems were caused by an alleged design defect. In conclusion, the court finds that plaintiffs have not demonstrated enough facts to warrant the court's finding that a jury employing the clear and convincing standard could reasonably find for either party. *See Anderson,* — U.S. at —, 106 S.Ct. at 2511.

The court does, as a side note, reject the defendants' argument that since K–W has been released from all liability, 4–J should likewise be released from all successor liability. Under a different factual scenario, the court could have found 4–J primarily and independently liable based on the service calls made by the plaintiffs to 4–J, after 4–J took over K–W's business. Therefore, conceivably their liability would result from their specific dealing with the plaintiffs rather than previous dealings with K–W. Regardless, the court finds that defendant 4–J's motion for summary judgment on plaintiffs' claim for fraud against it is hereby granted.

## A.O. SMITH CORPORATION, INC. & A.O. SMITH HARVESTORE PRODUCTS, INC.'S MOTIONS

The court will address A.O. Smith Corporation, Inc.'s and A.O. Smith Harvestore Products, Inc.'s motions for summary judgment simultaneously, as the plaintiffs appear to rely upon the same facts for piercing the corporate veil. For purposes of considering summary judgment motions, the following facts are uncontroverted.

1) AgriStor Credit Corporation and AOSHPI are separate, wholly-owned subsidiaries of defendant A.O. Smith Corporation, Inc.

2) At all times relevant to the case, defendant K–W Harvestore, subsequently K–W–H–I Company, Inc. was an independent dealer engaged in the sale, assembly, installation and service of Harvestores and related equipment.

3) AOSHPI owns no stock in K–W Harvestore System, Inc. or K–W–H–I Company, Inc. and did not elect their board of directors, select their officers or direct their day-to-day operations.

4) AOSHPI had no common employees, officers or directors with these corporations.

5) A.O. Smith does own all of the stock of AOSHPI. It is therefore in the position to elect the board of directors of AOSHPI which in turn elects the officers of AOSH-

PI. Some of Smith's officers and directors are also officers and directors of AOSHPI.

6) A.O. Smith and AOSHPI are separate corporate entities who maintain their own books and records and have separate boards of directors.

7) Since AOSHPI's incorporation in 1961, Smith has had no further involvement in the manufacturing, marketing or advertising of the equipment at issue, with those activities being conducted entirely by AOSHPI.

8) Neither AOSHPI nor AgriStor Leasing has operated an instrumentality or alter-ego of Smith. AOSHPI did not have the ability to direct the day-to-day affairs or operations of Smith.

9) The Wights have never talked with anyone who is an employee of AOSHPI or A.O. Smith and have never written to AOSHPI or A.O. Smith regarding any complaints in relationship to the equipment, and all calls were either made to Bud Turner or to K–W Harvestore or to 4–J Harvestore Systems, Inc.

10) AOSHPI prepared literature about the equipment which could be bought from dealers or AOSHPI.

## CONCLUSIONS OF LAW

The court first notes that the defendants, in their reply to plaintiffs' memorandum in opposition to their motions, do concede that their defense of statute of limitations should not be considered in ruling on said motions. The court will therefore not address the statute of limitations issue.

As previously ruled in this Memorandum & Order, plaintiffs' claims against A.O. Smith and AOSHPI for usury, strict liability, negligence and tortious breach of contract and breach of contract do not sufficiently state causes of action and thus summary judgment should also be granted in favor of the defendant A.O. Smith Corporation, Inc. and AOSHPI. Accordingly, the court will only address the remaining claims against them. The remaining claims include breach of warranties, both express and implied, violation of the Kansas Con-

sumer Protection Act, fraudulent and negligent misrepresentation, and a RICO claim against AOSHPI.

The court will first address the liability of A.O. Smith for the alleged actions of AOSHPI and its other subsidiaries. The court finds that *AgriStor Leasing v. Meuli*, 634 F.Supp. at 1213–14 states the law in Kansas in that a parent corporation has a separate corporate existence and is treated separately from its subsidiary in the absence of exceptions justifying disregard of the corporate entity. *Id.* at 1213 (citing *Quarles v. Fuqua Industries, Inc.*, 504 F.2d 1358 (10th Cir.1974)). The court in *Meuli* listed the ten factors which would justify disregarding a corporate entity, including factors such as if, the parent corporation owned all of the stock of the subsidiary, the parent and subsidiary had common directors, the subsidiary was inadequately capitalized, the subsidiary's finances are not independent of the parent corporation, and the formal legal requirements of the subsidiary as a separate and independent corporation are not observed. *Id.* at 1213. The court then examined the corporate structure of both Smith and AOSHPI.

The court found in the *Meuli* case and the court finds in this case that A.O. Smith owns one hundred percent of AOSHPI's stock, that companies share common officers and directors, and that A.O. Smith caused the incorporation of AOSHPI in 1961. In the *Meuli* case, as here, the plaintiffs have presented no evidence to show that AOSHPI was undercapitalized or that it relied on financial aid from the parent corporation. The court further finds that there is no evidence to establish that Smith and AOSHPI did not meet the formal legal requirements to justify to piercing of the corporate veil. The uncontroverted facts in this case also establish that since AOSHPI's incorporation in 1961, A.O. Smith had no further involvement in the manufacturing, marketing or advertising of the equipment at issue, with those activities being conducted entirely by AOSHPI.

The court therefore finds that plaintiffs have established no evidence to

demonstrate that a material issue of fact exists. The court further finds that, as a matter of law, there are no factors present which indicate this court should pierce the corporate veil and hold A.O. Smith liable for the alleged actions of its subsidiary. The court finds that there is not a scintilla of evidence to establish that AOSHPI was formed in 1961 to effectuate a concealment of Harvestore's alleged defects or to cover any illegality. The court finds persuasive the ruling in *AgriStor Leasing v. Meuli*. This ruling, which holds that A.O. Smith is free from liability, is also supported by the solvency of AOSHPI. *See also AgriStor Leasing v. Kjergaard*, No. 4–83–756 (D.Minn., *unpublished*, March 20, 1985). The court therefore finds that A.O. Smith's motion for summary judgment should be granted.

■ The court will first address plaintiffs' claims against AOSHPI for breach of express warranty. As the court discussed earlier in its Memorandum & Order, the purchase order was the final expression of agreement between the plaintiffs and KW. Thus, the only express warranty made to the plaintiffs has to be contained in the purchase order. The purchase order granted only repair and replacement of defective parts for a period of one year; in effect, limiting the time in which plaintiffs could bring an action. That time has run. As the court found in *AgriStor Leasing v. Meuli*, 634 F.Supp. at 1219, the parties' modification over the express warranty is not prohibited under Kansas law, either under K.S.A. § 84–2–316(1), or under the Kansas Consumer Protection Act. *See* K.S.A. § 50–639(f). Thus, AOSHPI's motion for summary judgment should be granted on plaintiffs' claim for breach of express warranty.

■ Plaintiffs' claims for implied warranty of fitness pursuant to K.S.A. § 84–2–315 must also fail. The Comment to K.S.A. § 84–2–315, specifically states that "a 'particular' purpose under this section means an unusual, nonordinary purpose." It is clear the the uncontroverted facts establish that the Harvestore equipment was bought for an ordinary purpose for which it was manufactured. Therefore, K.S.A. § 84–2–315 is clearly inapplicable and there was no implied warranty for a particular purpose.

The court will next address plaintiffs' claim for breach of implied warranty of merchantability. Defendants argue that the implied warranty of merchantability cannot be extended to a manufacturer of an alleged defective product for only economic loss suffered by a buyer who is not in contractual privity with the manufacturer. *See Professional Lens Plan, Inc. v. Polaris Leasing Corp.*, 234 Kan. 742, 675 P.2d 887 (1984). The court finds that it must agree with defendants' argument that an action cannot be brought for breach of implied warranty when there is no privity between the plaintiffs and AOSHPI. *See Professional Lens Plan, Inc., v. Polaris Leasing Corp.*, 234 Kan. 742, 752–53, 675 P.2d 887 (1984) (citing *Owens-Corning Fiberglas v. Sonic Development Corp.*, 546 F.Supp. 533, 541 (D.Kan.1982)).

■ In *Owens-Corning Fiberglas*, the court found that since the plaintiff did not buy the alleged defective products directly from that defendant but instead bought them from an intermediary in the chain of distribution, there was no privity between the plaintiff and that defendant, and thus no cause of action for breach of an implied warranty. *Id.* at 541. The court cited the fact that the Kansas Legislature had specifically rejected a draft version of K.S.A. § 84–2–318 which would have extend implied warranties to all foreseeable product users. Thus, the court found that absent privity, plaintiff cannot maintain a cause of action for breach of implied warranty against a manufacturer if only economic loss is claimed. *See also Professional Lens Plan, Inc. v. Polaris Leasing Corp.*, 238 Kan. 384, 388, 710 P.2d 1297 (1985) (which approved of the decision in *Owens-Corning Fiberglas v. Sonic Development Corp.*). The court therefore finds that defendant AOSHPI's motion for summary judgment on plaintiffs' claim for implied warranty should be granted. The court further finds that the decision cited by

plaintiffs, *Carson v. Chevron Chemical Co.*, 6 Kan.App.2d 776, 635 P.2d 1248 (1981), can be distinguished from the case at hand. In *Carson,* the court found that the manufacturer Chevron and the dealer worked hand-in-hand to sell the plaintiff the equipment at issue. The court found in that case, unlike the case at hand, that the manufacturer was actually the seller and the so-called seller was actually the applicator of the product.

■ The plaintiffs have also brought a RICO claim only against AOSHPI. The court finds that the decision in *AgriStor Leasing v. Meuli,* 634 F.Supp. at 1222–26, provides an in-depth analysis of the requirements in establishing a RICO claim and supports a finding by this court that AOSHPI's motion for summary judgment on plaintiffs' claim under RICO should be granted. The court specifically finds that plaintiffs have failed to establish a "pattern of racketeering activity". As the court found in *Meuli,* any mailings of allegedly fraudulent sales literature was done to further sales of the Harvestore system by KW, "this cannot be construed as entailing any more than one scheme." *Id.* at 1226. Therefore, as a matter of law, the plaintiffs have failed to establish a "pattern" of racketeering activity.

The Wights also claim that AOSHPI has violated the Kansas Consumer Protection Act by attempting to assert disclaimers and limitations under K.S.A. § 50–639. Based on the court's earlier finding in this Memorandum & Order that the stamped language appearing on the front of the lease agreements resurrects such warranties, and the earlier legal discussion on this issue, the court finds that summary judgment should be granted in favor of the defendant AOSHPI on plaintiffs' claim for violation of the Kansas Consumer Protection Act.

The final claim against AOSHPI is a claim for fraud. As defendants concede, any defense based on the statute of limitations has been waived by their failure to plead this defense in the affirmative. Actionable fraud is stated when it is demon-strated that an "untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or recklessly made with disregard for the truth, where another party justifiably relies on the statement and acts to his injury and damage." *Nordstrom v. Miller,* 227 Kan. 59, 65, 605 P.2d 545 (1980) (cites omitted).

■ In ruling on plaintiffs' claim for fraud, the court is mindful of the recent decision in *Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, —— –——, 106 S.Ct. 2505, 2509–12, 91 L.Ed.2d 202 (1986). In *Anderson,* the court found that in ruling on a motion for summary judgment on a claim for a fraud, the plaintiff has the burden of meeting the standard of proof that would apply at the trial on the merits. *Id.* at ——, 106 S.Ct. at 2511. Thus, the court must employ the "clear and convincing" evidence requirement and inquiry whether the evidence presented is such that a jury, applying that clear and convincing evidence standard, could reasonably find for either the plaintiff or the defendant. Upon a review of the record, the court finds that plaintiffs have not met this burden. The court finds that the plaintiffs have failed to state and support with sufficient evidence the agency relationship which they allege existed between AOSHPI and 4–J Harvestore and KW. The court also notes that plaintiffs have made very vague references to pamphlets, brochures, books and advertisements developed by AOSHPI. The court finds that plaintiffs have not definitively stated that they relied on pamphlets, brochures, books and advertisements in purchasing the equipment at issue. Based on plaintiffs' failure to produce evidence as to these facts, the court finds that plaintiffs have not proved the elements of fraudulent or negligent misrepresentation against AOSHPI.

In plaintiffs' petitions, plaintiffs alleged a violation of the Magnuson-Moss Warranty Act. The court finds that the decision in *AgriStor Leasing v. Markley,* No. 81–4163, (D.Kan., *unpublished,* June 4, 1984) [Available on WESTLAW, DCTU database] adequately addresses this issue. The court in

*Markley* rejected plaintiffs' motion to amend their answer on the grounds that the Magnuson-Moss Warranty Act is only applicable to warranty issues arising out of a consumer product transaction. As the equipment at issue is agricultural, designed for the specific purpose of storing and unloading grain, haylage, and other livestock feed, the Magnuson-Moss Warranty Act is inapplicable. In conclusion, the court finds that A.O. Smith Harvestore Products, Inc.'s motion for summary judgment should be granted in its entirety against all claims against it.

The court notes that A.O. Smith Corporation and A.O. Smith Harvestore Products, Inc. have also filed a motion to reconsider the Court's Memorandum and Order filed on October 1, 1986. The court finds that it need not address this issue based on the court's granting of both defendants' motions for summary judgment. The court therefore finds that defendants' motion to reconsider the Court's Memorandum and Order filed on October 1, 1986, is hereby denied as moot.

IT IS BY THE COURT THEREFORE ORDERED that defendants A.O. Smith Corporation, and A.O. Smith Harvestore Products, Inc.'s motion to reconsider the Court's Memorandum & Order filed on October 1, 1986, is hereby denied as moot.

IT IS FURTHER ORDERED that Agri-Stor Leasing's motion for summary judgment on plaintiffs' claims against it is hereby granted.

IT IS FURTHER ORDERED that A.O. Smith Corporation, Inc.'s motion for summary judgment on plaintiffs' claims against it is hereby granted.

IT IS FURTHER ORDERED that A.O. Smith Harvestore Products, Inc.'s motion for summary judgment on plaintiffs' claims against it is hereby granted.

IT IS FURTHER ORDERED that 4-J Harvestore Systems, Inc.'s motion for summary judgment as to all claims by plaintiffs against it is hereby granted.